THE CITY OF CHICAGO, Appellee, *vs.* H. H. GREEN, Appellant.

*Opinion filed February 19, 1909.*

1. SANITARY DISTRICTS—*purpose of the Sanitary District act of 1889.* The purpose of the Sanitary District act of 1889 was to furnish a common outlet for the sewage of the incorporated municipalities within the limits of the district, recognizing the existence of such municipalities without seeking to curtail their powers except in the one matter of the common outlet for their drainage and sewage.

2. SAME—*terms "adjuncts" and "additions," used in Sanitary District act, construed.* The terms "adjuncts" and "additions," used in the Sanitary District act, do not refer to common sewers, but mean auxiliary channels to bring to the main channel the sewage and drainage from the various sewers and systems of sewers of the municipalities within the limits of the sanitary district.

3. MUNICIPAL CORPORATIONS—*Sanitary District act does not deprive cities of power to construct sewers.* The Sanitary District act was not intended to deprive the municipalities within the district of the power to construct, by special assessment, sewers for local drainage of lands within the limits of such municipalities, even though such sewers have their outlet in the main channel of the district or some adjunct or addition thereto.

4. CANALS—*canal commissioners may grant permit to build a siphon under canal.* The provision of the constitution precluding any sale or lease of the Illinois and Michigan canal unless it is authorized by a vote of the people does not deprive the canal commissioners of the power to grant the right of building a sewage siphon under the canal in such a manner as not to interfere with the free use of the canal for navigation.

5. SPECIAL ASSESSMENTS—*city must acquire right to enter upon land to build a sewer before levying assessment.* The right of a city to construct and maintain a sewage siphon under the Illinois and Michgan canal constitutes a perpetual easement in favor of the city, which can be acquired only by deed, prescription or condemnation and not by a mere resolution of the canal commissioners; and under section 53 of the Local Improvement act the city has no power to levy a special assessment for the sewer before such easement is acquired. (*Village of Hyde Park* v. *Borden,* 94 Ill. 26, distinguished.)

FARMER and VICKERS, JJ., dissenting.

APPEAL from the County Court of Cook county; the Hon. W. L. POND, Judge, presiding.

EDWIN L. HARPHAM, CHARLES W. GREENFIELD, for appellant:

The authority to construct the improvement in question is vested in the board of trustees of the Sanitary District of Chicago. (Hurd's Stat. 1905, secs. 4, 7, 23, p. 359.) It is the construction of an "adjunct or addition" to the main channel, and said board has the same authority to build it as to build the main channel.

This case is distinguished from *Rich* v. *Chicago,* 152 Ill. 18, *Gage* v. *Chicago,* 225 id. 221, *MacChesney* v. *Chicago,* 227 id. 216, and *Gage* v. *Wilmette,* 230 id. 428, because in neither of these was the improvement an adjunct, but an independent sewer emptying into Lake Michigan and separate from the system created by the act of 1889.

Two distinct municipal corporations cannot exercise the same power, jurisdiction and privileges in the same territory at same time. *Park Comrs.* v. *Chicago,* 152 Ill. 392.

Section 53 of the Local Improvement act, relating to the acquisition of land and possession, has not been complied with herein. These are necessary conditions precedent to the exercise of the power of assessment. *People* v. *Talmadge,* 194 Ill. 68.

The interest the city must acquire in canal lands to construct this improvement is an easement, which can be acquired only by deed, prescription or condemnation. Rev. Stat. chap. 77, sec. 3; *Rich* v. *Chicago,* 152 Ill. 18; *Woodward* v. *Seely,* 11 id. 157; *Tanner* v. *Volentine,* 75 id. 624; *Kamphouse* v. *Gaffner,* 73 id. 453; *Forbes* v. *Balenseifer,* 74 id. 183; *Dwight* v. *Hayes,* 150 id. 273.

Whatever right the city acquired from the commissioners of the Illinois and Michigan canal was acquired by a resolution and not by deed, which is insufficient to pass an easement. Even if a deed had been passed it would have

been void, since the canal may not be sold or leased without submitting the proposition to a popular vote. This inhibition applies to giving away. Endlich on Interpretation of Statutes, sec. 431.

Taking any step to impair the capacity or usefulness of the canal without the consent of the Federal government is a violation of the act of Congress of March 2, 1827, providing that "said canal, when completed, shall forever remain a public highway for the use of the government of the United States." Any obstruction above or below the surface of the canal which may limit its potential capacity violates the spirit of that act.

The proposed improvement will violate the act of Congress of March 3, 1899, (30 U. S. Stat. at Large, p. 1151,) forbidding the altering or modifying of the condition or capacity of any navigable water of the United States unless upon the recommendation of the chief engineer and the authorization of the Secretary of War. Both the Illinois and Michigan canal and the drainage canal are navigable, according to the rule laid down in *The Daniel Ball,* 77 U. S. 557. The condition and capacity of both will be modified by the proposed improvement, and the evidence tends to show that no recommendation and authorization by the aforesaid officers was obtained. As none was shown by the city it may be assumed none exists. *Railroad Co.* v. *Bacon,* 30 Ill. 347; *Williams* v. *People,* 121 id. 84.

This point may be raised by property owners as well as by the United States. *Chicago* v. *Law,* 144 Ill. 569; *Edwards* v. *Chicago,* 140 id. 353.

The construction of the inverted siphon under the bed of the Illinois and Michigan canal, as described in the ordinance, will make it subject to removal at any time by the United States authorities. *Chicago* v. *Law,* 144 Ill. 569; *Railway Co.* v. *People,* 214 id. 9; *Railway Co.* v. *Chicago,* 201 U. S. 506; *United States* v. *Irrigation Co.* 174 id. 690.

GEORGE A. MASON, and FRANK JOHNSTON, JR., (ED-
WARD J. BRUNDAGE, Corporation Counsel, of counsel,) for
appellee:

The proposed sewer is not an "adjunct" or an "addi-
tion" to the main channel of the sanitary canal, within the
meaning of the Sanitary District act.

The record does not show that the drainage system con-
templated by the Sanitary District act has been completed,
and until such drainage is completed the question whether
the power to construct a sewer in the city of Chicago is
vested exclusively in the trustees of the sanitary district
does not arise. *Rich* v. *Chicago,* 152 Ill. 18; *Gage* v. *Chi-
cago,* 225 id. 218.

The record shows that the canal commissioners of the
Illinois and Michigan canal, by a resolution, granted per-
mission to the city of Chicago to construct the proposed
sewer underneath the canal. Section 53 of the Local Im-
provement act of 1897 provides that "no special assessment
or special tax shall be levied for any local improvement un-
til the land necessary therefor shall be acquired and in pos-
session of the municipality, except in case where proceed-
ings to acquire said land have been begun and proceeded to
judgment." "Levied," as used in this section, means the
confirmation of the assessment, and the permission of the
canal commissioners having been obtained before such con-
firmation, was in apt time. Permits are in apt time if ob-
tained before confirmation. *Hyde Park* v. *Borden,* 94 Ill.
26; *Holmes* v. *Hyde Park,* 121 id. 128; *Hunerberg* v.
*Hyde Park,* 130 id. 156; *Leman* v. *Lake View,* 131 id. 138;
*Goodwillie* v. *Lake View,* 137 id. 61; *Burhans* v. *Norwood
Park,* 138 id. 147.

"Land" may mean an easement or right of way. A
street railway right of way is land subject to assessment.
In condemnation suits the petitioner gets only such estate
as is needed for its purposes. *Rich* v. *Chicago,* 152 Ill. 18;
*Iron Co.* v. *Morris Co.* 44 N. J. Eq. 398; Const. of 1870,

art. 18, sec. 2; *Railroad Co.* v. *Clapp*, 201 Ill. 418; *Cemetery Co.* v. *Railroad Co.* 68 N. Y. 591; *Railroad Co.* v. *Allen*, 22 Kan. 285.

The construction of the sewer under the bed of the Illinois and Michigan canal will not constitute such an obstruction to navigation as will subject it to removal at any time by the United States authorities. An obstruction is such an impediment as renders navigation less convenient, less secure and less expeditious. *State* v. *Narrow Club*, 100 N. C. 477; *Bridge Co.* v. *Halliday*, 4 Ind. 36.

Mr. JUSTICE CARTER delivered the opinion of the court:

The city of Chicago instituted these proceedings under the Local Improvement act of 1897, to construct by special assessment a brick sewer having a concrete bulkhead at its outfall, and extending from a point on the southerly line of the main drainage canal of the Sanitary District of Chicago south-easterly a short distance across the right of way of the sanitary district and thence south in Kedzie avenue to West Seventy-first street. The diameter of the sewer is nine feet at the mouth and decreases gradually to six and one-half feet. Its total cost is estimated at $370,000. It passes, near its mouth, under the Illinois and Michigan canal by means of a concrete inverted siphon, having as supports concrete bulkheads constructed adjacent to the waters of the canal on each side. The assessment is divided into ten installments, the aggregate total of appellant's being $14,256. The drainage district is about six miles in length, the southern boundary being Eighty-seventh street, and it extends east and west for most of the way from Sacramento avenue to Central avenue, a distance of about three-quarters of a mile. On the hearing of legal objections before the county court of Cook county the assessment on certain properties south of Seventy-first street, not including the property objected for, was reduced, and the amount

of reduction was added to the public benefits charged to the city of Chicago. All the legal objections were thereupon overruled. A jury trial as to benefits appears to have been waived and the matters submitted to the trial judge, who found for the petitioner on the question of benefits and entered an order accordingly. This appeal followed.

The first, and one of the chief contentions, of the appellant is that the proposed sewer is an "adjunct" or "addition" to the main channel of the sanitary district, within the meaning of the Sanitary District act of 1889, (Hurd's Stat. 1908, p. 375,) and that, therefore, the board of trustees of the said district are the corporate authorities authorized by law to levy the assessment and construct this improvement. Appellant relies upon the cases of *Rich* v. *City of Chicago,* 152 Ill. 18, *Gage* v. *City of Chicago,* 225 id. 218, *MacChesney* v. *City of Chicago,* 227 id. 215, *Gage* v. *Village of Wilmette,* 230 id. 428, and *Northwestern University* v. *Village of Wilmette,* 230 id. 80. The *Rich case, supra,* merely held as to that point, in substance, that as the work of the proposed sanitary district under said act of 1889 was not completed, the law could not, in any event, apply at that time. The other cases cited above have followed the ruling in the *Rich case,* and for the same reason.

It is contended by appellant that this record shows that the main channel of the sanitary district has been completed and opened for use, and that, therefore, it is a fair construction of the Sanitary District act that this sewer is an "adjunct" and must be built by said sanitary district. It is quite evident from this record, as contended by appellee, that much of the work of the sanitary district, under the act, is still incomplete. But conceding, for the sake of the argument, that the main channel being completed from the Chicago river to Lockport, so that the waters of Lake Michigan have been for several years flowing through the drainage canal, the DesPlaines and Illinois rivers into the Mississippi, therefore the drainage system is completed, as

that question was considered and referred to in the *Rich case, supra,* must the conclusion contended for by appellant prevail?

A consideration of the various provisions of the Sanitary District act of 1889 leads, it seems, irresistibly to the conclusion that this act was passed to furnish a common outlet for the sewage of the incorporated municipalities within the limits of the district, recognizing the existence of these municipalities without seeking to curtail their powers except in the one matter of a common outlet for their drainage and sewage. This court, in *Wilson* v. *Board of Trustees,* 133 Ill. 443, and in *People* v. *Nelson,* 133 id. 565, considered and discussed various features of this act. It is manifest from a reading of those decisions that the court at that time did not consider that the act was passed for the purpose of taking charge of, controlling and constructing sewers by special assessments, for the purpose of local drainage, but rather to furnish a common outlet for all the sewers within the boundaries of the sanitary district. This court, in *People* v. *Nelson, supra,* speaking by Mr. Justice Bailey, said (p. 580) : "The general sanitary scheme adopted by the act consists of creating certain districts comprising certain areas of contiguous territory, and empowering such districts to construct and maintain a common outlet for the drainage and sewage of their respective territories. That scheme is indicated in the first section of the act, as follows: 'That whenever any area of contiguous territory within the limits of a single county shall contain two or more incorporated cities, towns or villages, and shall be so situated that the maintenance of a common outlet for the drainage thereof will conduce to the preservation of the public health, the same may be incorporated as a sanitary district under this act.' Of course, it must be conceded, both as a historical fact and as a fact abundantly shown by the terms of the act itself, that this scheme was formulated mainly, if not exclusively, with reference to the sanitary

condition and needs of the city of Chicago and its environs, and we cannot give proper construction to the act without taking into account the peculiar situation of the territory which the proposed Sanitary District of Chicago was intended to embrace. Chicago is a city of probably one million inhabitants or more, and is bordered on the east by Lake Michigan, that lake being the source of its water supply. A few miles west of Chicago, and running in a north and south direction, is the DesPlaines river, and at a point opposite the southerly part of the city the said river turns toward the south-west and runs in that direction to the city of Joliet, below which it is known as the Illinois river. The territory between Lake Michigan and the DesPlaines river, and along the course of that river to Joliet, is nearly level, none of it being more than a few feet above the level of the lake, while at Joliet the general surface is quite a number of feet below the level of the lake. The object of the system of drainage proposed by said act is to prevent the drainage and sewage of the city and its environs being carried into Lake Michigan, thereby contaminating the waters of the lake. This result is to be reached by cutting a channel which will give an outlet for the drainage and sewage of the city in the direction of the DesPlaines and Illinois rivers, and which will also cause a large flow of water from the lake, through the proposed artificial channel, into those rivers for the purpose of diluting the sewage and rendering it innocuous to the people living along the course of those streams."

It was argued in both of these cases that the work in question was a local improvement, and that, therefore, under the provisions of the constitution, especially section 9 of article 9, no municipality, except cities, towns and villages, could make such an improvement. This court, in discussing that question in *Wilson v. Board of Trustees, supra,* speaking through Mr. Justice Scholfield, said (p. 469): "It would be a sufficient answer to this to say that it is not

shown, by anything in the record before us, that the improvement here contemplated is a 'local improvement,' within the meaning of those words as used in this clause. In a general sense all improvements within a municipality are local,—that is, they do not extend to all parts of the State; they have a locality; are nearer to some persons and property than to others. But it is evident that is not what is here meant by 'local improvements,' for if it were, it would have been more natural and lucid to have said 'improvements' without other qualification, or, simply, 'municipal improvements.' We are to give all the words employed some meaning, if we can, and so we must consider 'local improvements' in connection with 'special assessment,' for the local improvement contemplated is one that can be made by special assessment, if only the corporate authorities shall elect to make it in that way. * * * But all improvements within a municipality are not, by reason of their locality, a special benefit to some real property beyond their benefits to real property generally throughout the municipality, but many times the result is directly the reverse,— that of a positive injury, in the loss of values. In such cases it is clear the improvement could not be made by special assessment, and it is not to be presumed that a constitution would contain the absurdity of prohibiting the doing of an impossibility, as, for instance, that the General Assembly should not authorize any but the corporate authorities of cities, towns and villages to make local improvements by special assessment, when such improvements are of that character that they cannot be made by special assessment. * * * Whether, in a given case, an improvement is of that character that it can be made by special assessment is a question of fact, and not of law. It is quite probable that the relation of benefits and cost of improvement to particular property would be very different in the case of a great drain, intended to benefit an extended area of city and country by affording outlets for a vast number of sewers and

also an outlet for the stagnant waters of river and lake, than it would be in the construction of an ordinary sewer, benefiting only contiguous property holders by carrying off the sewage flowing from their property. We cannot take notice, as a matter of law, that the drain here contemplated is a 'local improvement' within the contemplation of the first clause of section 9, article 9, of the constitution, so that it can be made by a 'special assessment.' " It was argued in that case that the Sanitary District act was an attempt to invest new corporations with the functions of local government with the powers of a municipal corporation, and we said (p. 477) : "It will be quite time enough to meet that question when it shall arise. A case presenting the question of the power of the General Assembly to authorize the re-distribution of the powers of an existing city, town or village to a number of corporations equal to the number of the powers distributed, for the purpose of getting rid of restrictions upon the old corporation, is so essentially and palpably different from the present case that it would be entirely irrelevant to stop to consider it. The present legislation may be unwise—improvident—even vicious; but it does not follow that it is unconstitutional. * * * This legislation preserves, to the fullest extent, the principles of local self-government."

Considering the opinions in those cases, especially in connection with the dissents filed in both, it is apparent that this court did not then consider that the Sanitary District act was intended to turn over to the corporate authorities of the district the control of all of the ordinary sewers and drains necessary to drain the territory within its boundaries, but rather that the law was enacted for the purpose of constructing a main channel or outlet for all the sewers and drains of the various municipalities within the district, and to build such adjuncts and additions and auxiliaries as a part of said main channel as would make it possible to connect all such drains and sewers of the various municipali-

ties with said main channel. The same conclusion as to the purpose of this act was reached by this court in *Beidler* v. *Sanitary District,* 211 Ill. 628. In discussing that question we said (p. 637): "It is evident from an examination of the act for the creation of sanitary districts, that the primary and principal purpose of their creation under the statute is to provide for the preservation of the public health by improving the facilities for the final disposition of sewage and by supplying pure water. The fact that a navigable waterway may be created is a mere incident, and not one of the purposes for which a sanitary district is created." This question, however, is of such great importance and is so earnestly argued by counsel that we deem it proper to call attention to some facts leading up to the passage of this law.

While we think the wording of the law is clear and unambiguous, if there be any doubt as to its meaning the courts may, in order to find its purpose or intent, take into consideration the contemporary circumstances and external or historical facts which led to its enactment and read it in the light of such surrounding facts. (*People* v. *Harrison,* 191 Ill. 257; 2 Lewis' Sutherland on Statutory Construction,—2d ed.—sec. 462; 26 Am. & Eng. Ency. of Law,— 2d ed.—p. 632.) In seeking for the legislative intention we may consider not only the language used, but also the object to be attained and the evil to be remedied. *Hogan* v. *Akin,* 181 Ill. 448.

The history of the attempts to keep the sewage and drainage out of Lake Michigan by pumping it into the Illinois and Michigan canal, for many years previous to the passage of this law, is concisely and fully set forth in the opinion of this court in *Canal Comrs.* v. *Sanitary District,* 191 Ill. 326. In 1880 the citizens' association of Chicago appointed a committee to study the subject of a main drainage channel for that city, and among their plans for the disposition of the sewage the construction of a canal or

"new river" connecting Chicago river and the DesPlaines valley was recommended. (Brown on Drainage Channel and Waterway, p. 336.) In 1885 another committee, after discussing various schemes, suggested to the citizens' association that unquestionably the proper disposition of the sewage was by way of the Illinois valley. (Brown on Drainage Channel and Waterway, p. 343.) In 1886 the city council of Chicago, by resolution, authorized the creation of a drainage and water supply commission, to be appointed by the mayor, to study the problem. That commission was appointed, and reported to the city council in January, 1887, that the problem demanded two things,—the protection of the water supply and the removal of the river nuisance,—and stated that there were three possible methods of getting rid of the sewage of Chicago: one by discharging it into Lake Michigan; another by means of a sewage farm; and the third through the DesPlaines and Illinois valley, with a sufficient dilution of water to make it sanitary to the people of the valley. (Brown on Drainage Channel and Waterway, p. 345.) In 1887 two bills were introduced in the legislature touching upon the proper solution for an outlet for Chicago sewage and protecting the water of Lake Michigan from contamination. (Brown on Drainage Channel and Waterway, p. 374.) In May, 1887, a joint resolution was passed by the Illinois legislature providing for the appointment of a committee of five, consisting of the mayor of Chicago, (*ex-officio,*) two members of the House and two members of the Senate, to examine and report to the next session of the legislature on the subject of the drainage of Chicago and its suburbs, and stating, "if such commission shall find, upon investigation, that the most practicable solution of the problem is in the construction of a waterway for the sewage from Chicago to the DesPlaines river at or near Joliet, the commission shall report what requirements shall be made as to the construction of such waterway and the dilution of such sewage for the

protection of the health and comfort of the people at and below Joliet." (Brown on Drainage Channel and Waterway, p. 375.) This commission reported the Sanitary District act substantially as it was passed that year by the legislature. In its report accompanying such act the commission stated that it had "diligently studied the subject submitted to it in all its sanitary and commercial aspects. It has visited and surveyed the territory sought to be improved. Conferences have been held with representatives from all the leading cities, towns and villages affected. * * * All plans for meeting the demands of the river and valley communities and the pressing needs of Chicago have been carefully examined by this commission. The plan agreed upon by the commission, as set forth in detail in the bill which accompanies this report, is believed by the commission to be the most feasible, practicable and satisfactory method for all the varied interests involved." (Brown on Drainage Channel and Waterway, p. 376.) The discussion before the legislature, as well as these various reports, discloses that the problem that was being studied was not the building of ordinary sewers, whether trunk (such as the one here under discussion) or lateral, by special assessments, but the finding of a common outlet for the sewage of Chicago and its suburbs, thus preventing the contamination of the water of Lake Michigan. These reports and discussions contain frequently the words "main drainage system," "outlet channel," "intercepting sewers," and other terms which indicate clearly that it was an outlet for the sewage, and not the building of ordinary sewers, that was under consideration. It is also manifest, not only from the Sanitary District act but from the surrounding facts and circumstances, that as a part of the work of disposing of the sewage of the municipalities in the sanitary district by an outlet through the DesPlaines and Illinois rivers, it was intended at the same time to assist in building a great waterway from Lake Michigan to the Mississippi river,

with the incidents of dockage and water power which would necessarily follow from a navigable channel of the proposed size and location.

The quotation already given from section 1 of the act of 1889 tends strongly to show its purpose. Section 7 of the act provides that the trustees of "any sanitary district organized under this act shall have power to provide for the drainage of such district by laying out, establishing, constructing and maintaining one or more main channels, drains, ditches and outlets for carrying off and disposing of the drainage (including the sewage) of such district, together with such adjuncts and additions thereto as may be necessary or proper to cause such channels or outlets to accomplish the end for which they are designed in a satisfactory manner. * * * Such channels or outlets may extend outside of the territory included within such sanitary district, and the rights and powers of said board of trustees over the portion of such channel or outlet lying outside of such district shall be the same as those vested in said board over that portion of such channels or outlets within the said district." Section 20 provides that "any channel or outlet constructed under the provisions of this act which shall cause the discharge of sewage into or through any river or stream of water beyond or without the limits of the district constructing the same shall be of sufficient size and capacity to produce a continuous flow of water of at least two hundred cubic feet per minute for each one thousand of the population of the district drained thereby." In almost every section, as the act was originally passed, the improvement proposed is designated by the words "channel" or "outlet," and if the words "drain" or "ditch" are used they are found in connection with the words "channel" or "outlet," in such a manner as to indicate that all of the words are used with practically the same meaning.

When the Sanitary District act was first passed, the territory within its limits included the whole of the city of

Chicago, the whole of the towns of Hyde Park, Lake View, Calumet and Jefferson, part of the town of Cicero, and the village of Riverside. By the act of 1903 (Hurd's Stat. 1908, p. 384,) the Sanitary District of Chicago was enlarged so as to take in all of the territory extending from the limits of Cook county on the north to and including all of the city of Chicago as now constituted, and all of the territory on the lake front from Lake county to the Indiana State line, and along the Indiana State line to about three miles south of the southern limits of the city of Chicago. The territory of the sanitary district as originally organized contained one hundred and eighty-five square miles. By this act of 1903 some seventy-eight square miles was brought within its limits on the north and ninety-four and one-half square miles on the south. As the limits are now extended the Sanitary District of Chicago includes within its boundaries all of the city of Chicago; all of the city of Evanston, the villages of Wilmette, Gross Point, Kenilworth, Winnetka and Glencoe on the north; Oak Park, Berwyn, Lyons, Summit and the incorporated town of Cicero on the west; Evergreen Park, Morgan Park, Blue Island, Riverdale and Harvey on the south, and several other smaller villages and hamlets. If the legislature intended to deprive all of these municipalities of the control of their local sewers, it is to be presumed that such intent would be plainly expressed in the act and not left to obscure or doubtful implication.

Sewers were first constructed in municipalities by special assessments under the act of 1885. (Hurd's Stat. 1908, p. 373; *Village of Hyde Park* v. *Spencer,* 118 Ill. 446; *Village of Hyde Park* v. *Carton,* 132 id. 100; *McChesney* v. *Village of Hyde Park,* 151 id. 634.) Having in mind some of the problems the Sanitary District act was passed to solve, the legislature in 1887 passed the so-called Chicago Drainage District act. (Hurd's Stat. 1908, p. 374.) This act, in addition to the powers granted to other mu-

nicipalities by the said act of 1885, granted to Chicago the power to construct works to control the flood waters of the DesPlaines river in such a manner as to prevent them from coming into the Chicago river over the Summit divide and carrying the sewage that was turned into the Chicago river out into Lake Michigan. In 1899 the legislature passed an act authorizing cities of 100,000 population and under to construct outlet sewers. (Hurd's Stat. 1908, p. 450.) That act was not intended to authorize municipalities to construct sewers such as the one here in question, or to deprive the municipalities of their power to do that under said act of 1885 or the Local Improvement act of 1897, but simply to grant to cities under 100,000, in accordance with the provisions of said act, power to construct outlet sewers. The Sanitary District act was passed, as Judge Bailey said in the *Nelson case, supra,* mainly to help solve the sanitary and sewage problems of Chicago by giving it an outlet for its drainage and sewage. The legislature recognized that Chicago was the only city in the State that had over 100,000 people, and therefore the act of 1899, in its practical effect, applied to all cities in the State other than Chicago, and was evidently passed to give to the other cities the same power to build outlet sewers that was provided by the Sanitary District act for Chicago and the other municipalities within the limits of the Sanitary District of Chicago.

Section 2 of the act of 1903, which enlarged the boundaries of the Sanitary District of Chicago, states that the board of trustees of said district shall have the right to provide for the district added by this act, "by laying out, establishing, constructing and maintaining one or more channels, drains, ditches and outlets for carrying off and disposing of the drainage (including the sewage) of such district, together with such adjuncts and additions thereto as may be necessary or proper to cause such channels or outlets to accomplish the end for which they are designed in a satisfactory manner, * * * and shall maintain the same

238—18

proportion of dilution of sewage through such auxiliary channels as it may construct and join to its main channel as is now required by the act creating said sanitary district." Manifestly, from the reading of this section the words "adjuncts" and "additions" are used as meaning the same as "auxiliary channels." Indeed, the words "addition" and "auxiliary" are synonyms of "adjunct." (Standart Dict.) Counsel for appellant argue that an adjunct or addition is a thing joined to or connected with another thing, and that as this sewer joins the main channel of the sanitary district it is an "adjunct." It is not the primary signification or the dictionary definition of the word that necessarily controls. Whenever the meaning of a word in a legislative act is important, we must discover its meaning by finding the sense in which it was intended to be used by the legislative body, for that must control, although the word may be used without a strict regard for its appropriate and primary meaning. *City of Springfield* v. *Green,* 120 Ill. 269.

There is no possible basis for arguing from preceding legislation, its history and surroundings, that the Sanitary District act was intended to empower the authorities of the sanitary district to take charge of the building of the sewers of the cities, villages and municipalities within the limits of the district, and the only possible chance for making this argument from the act itself is in 'the construction that is attempted to be placed upon the words "adjuncts" and "additions." It is evident, not only from the amendment of 1903, enlarging the sanitary district, but also from the history of all legislation on the subject, that as a part of the scheme for getting an outlet for sewage and preventing the contamination of the water of Lake Michigan it was understood that it might be necessary to build an auxiliary channel connecting the north branch of the Chicago river with Lake Michigan north of and in the neighborhood of the city of Evanston, and another auxiliary channel in the southern

part of Chicago, in the so-called "Calumet district." The question was also considered, as appears from the reports heretofore referred to, that it might be necessary to have a cut-off connecting the south branch of the Chicago river with the lake at or near Sixteenth street, or at other points, and also another cut-off connecting the north branch with Lake Michigan at or near Fullerton avenue. In the light of these surrounding facts it seems manifest that the words "adjuncts" and "additions" were used as referring to these auxiliary channels or others of like nature. They are called, as we have seen, in the act of 1903, "auxiliary channels." It needs no argument to prove that the legislature did not there use the words "auxiliary channel," "adjunct" or "addition" as meaning a common sewer, as is here contended.

It would be most unreasonable to conclude that the words "addition" and "adjunct," as used with reference to the main channel,—this common outlet for the sewage of Chicago, costing many millions of dollars,—were intended to include not only such auxiliary channels as have been referred to, but the ordinary sewers of all cities and towns and municipalities within the sanitary district, including even the smallest lateral sewer or branch. Such a construction would make the act obnoxious to the charge urged against it in the *Wilson case, supra,* that it did not preserve the principles of local self-government in the various municipalities in the sanitary district. The words "adjunct" and "addition," as used in this act, mean simply auxiliary channels to bring the sewage and drainage from the various sewers and systems of sewers of the municipalities in the limits of the sanitary district into the main channel of the sanitary district. It was not intended that the sanitary district should be charged with and have the authority of constructing and maintaining local improvements for the local drainage and sewage of lands and property, such as the one here in question.

What we have said on this subject fully disposes of the second point of appellant, that a large part of the present drainage of the territory assessed by this proceeding naturally empties into the main channel of the sanitary district through a portion of the south branch of the Chicago river.

For the purpose of building the siphon part of the sewer the city authorities of Chicago obtained from the commissioners of the Illinois and Michigan canal a permit, by a resolution, which provided that "permission to lay a sewer in Kedzie avenue, across the right of way and under the bottom of the Illinois and Michigan canal, by means of a siphon, be and the same is hereby granted, on condition, however, that the top of said sewer shall, at all points in crossing the channel of said canal and between the banks thereof, be below the bottom of said canal, and shall be so laid as not in any manner to interfere with the navigation and the passage of boats plying said canal," etc. Appellant argues that the canal commissioners had no authority to grant such permit, because of the section of the constitution (Hurd's Stat. 1908, p. 75,) which provides that "the Illinois and Michigan canal shall never be sold or leased until the specific proposition for the sale or lease thereof shall first have been submitted to a vote of the people," etc., and contends that this permission practically amounts to a lease of a portion of the Illinois and Michigan canal. We do not think this is a fair or reasonable construction of this constitutional provision. If this argument obtained, then the authorities of the Illinois and Michigan canal could not permit any city to build a water main under it or a bridge across it until authorized by a vote of the people of the State. This contention answers itself.

On March 13, 1907, the canal commissioners adopted a resolution "that the application of the city of Chicago for permission to lay a sewer in Kedzie avenue, across the right of way and under the bottom of the Illinois and Michigan canal by means of a siphon, be and the same is hereby

granted," on certain conditions as to the manner of construction. It is insisted that this resolution was a mere revocable license, that it conveyed no easement to the city, and that the assessment, therefore, could not be confirmed because the city had not acquired the land necessary therefor, as required by section 53 of the Local Improvement act. That section reads as follows: "No special assessment or special tax shall be levied for any special improvement until the land necessary therefor shall be acquired and in possession of the municipality, except in cases where proceedings to acquire such land shall have been begun and proceeded to judgment." (Hurd's Stat. 1908, p. 435.) The right to construct and maintain this sewer would impose upon the land over which it might be constructed a perpetual servitude, constituting a perpetual easement in favor of the city, which is a freehold estate in the land. (*Chronic v. Pugh,* 136 Ill. 539.) Such an estate can be acquired only by deed, prescription or condemnation. A mere license, whether oral or in writing, is not sufficient, for it may be revoked at any time. (*Woodward* v. *Seely,* 11 Ill. 157; *Tanner* v. *Volentine,* 75 id. 624; *Forbes* v. *Balenseifer,* 74 id. 183; *Kamphouse* v. *Gaffner,* 73 id. 453; *Village of Dwight* v. *Hayes,* 150 id. 273; *Entwhistle* v. *Henke,* 211 id. 273.) The resolution was not a conveyance. It merely purported to give permission to do what without such permission would be unlawful. It would be a protection against an action of trespass for acts done under it before revocation, but it is revocable by the commissioners at any time. Under section 53, above quoted, the acquisition of the right to enter upon the land for the purpose of constructing the sewer is a condition precedent to the power of the city to levy the assessment. The resolution does not give such right. It is not necessary to determine what the rights of the city might be if it should construct the sewer under the license. It has no right which it can enforce to construct the siphon under the canal, and is therefore not

in a position to levy the assessment. In the case of *Village of Hyde Park* v. *Borden*, 94 Ill. 26, the resolution of the park commissioners granting permission to construct the sewer across the boulevards is called a license, and the objection urged against it does not appear from that case to be the same as that made here, that it conferred no right which was not revocable at the will of the grantor, but it was that the license was granted subsequent to the passage of the ordinance; that the ordinance was void because it required the sewer to be constructed across the boulevards without making any provision for acquiring the right to make the improvement on such property, and that the validity of the ordinance must be determined by the power of the village and the state of facts existing at the date of the passage of the ordinance. The court decided that the statute did not require the ordinance, when providing for an improvement, to make any provision for acquiring the right to make the improvement upon the property of others, and that the permission granted by the park commissioners entirely obviated the objections on that account, though not obtained until after the passage of the ordinance. This case was decided long before the passage of the Local Improvement act of 1897, in which the requirement that title shall have been acquired before the levy of an assessment first appears. It was therefore immaterial, and the court did not decide, what sort of right, if any, was acquired by the resolution. This decision has no bearing on the proper construction to be placed upon said section 53 of the Local Improvement act. The objection that the land necessary for the improvement had not been acquired should have been sustained.

Our decision on the last point renders unnecessary a discussion of the other errors complained of.

The judgment of the county court is reversed and the cause remanded.                    *Reversed and remanded.*

FARMER and VICKERS, JJ., dissenting.