THE THOMAS BENNETT ESTATE, INC. *vs.* THE CITY OF NEW HAVEN ET ALS.

MALTBIE, C. J., HAINES, HINMAN, BANKS and AVERY, Js.

Argued March 9th—decided June 13th, 1933.

*George W. Crawford,* for the appellant (plaintiff).

*David M. Reilly,* with whom, on the brief, was *David J. McCoy,* for the appellees (defendants).

AVERY, J. The plaintiff brought this action to restrain the city of New Haven and its collector from claiming or filing liens against its property, on account of an assessment for benefits in connection with a public improvement undertaken to provide a more convenient approach to the railroad station. The plaintiff also asks for a decree determining that the assessment against its property was null and void, and removing all clouds upon its title as a result thereof, and quieting the same. The action was tried to the court, and judgment rendered in favor of the defendants, from which the plaintiff has appealed.

The contentions of the plaintiff on this appeal as raised by its assignments of error resolve themselves into four claims: First, that the assessment against the plaintiff's property was void for want of power to lay it at the time of the action by the board of aldermen of the city purporting to lay the same; second, that the collection of the assessment at the present time and for any purpose for which its proceeds can now be used is contrary to the specifically declared purposes of the board of aldermen in laying the assessment; third, that the right of the plaintiff to relief in this action is not foreclosed by its failure to appeal within thirty days of the assessment; and, fourth, a certain ruling on evidence.

The plaintiff asks certain corrections in the finding as made, but no correction is permissible which will

alter the situation to the advantage of the plaintiff. From the finding, and exhibits made a part of it, it appears that in the year 1917, a new railroad station was built in the city of New Haven. At about the time of the completion of the structure, the city authorities determined that a more adequate public approach to the same was necessary. Upon the initiative of the city planning commission, a new thoroughfare was projected for this purpose, consisting in the extension of Orange Street, already in existence, to the new station, and certain incidental improvements. The whole was known as the "Orange Street Extension Plan." Orange Street previously ended at George Street, which ran at right angles with it. A vital feature of the plan was the cutting and extending of Orange Street through a solid block of land and buildings lying between George and Meadow Streets. This block completely separated Orange Street proper from a newly-created street, part of the plan, now known as South Orange Street. The latter ran from Meadow Street to the station.

The plaintiff's property is located on Chapel Street, Nos. 765 to 777 inclusive. It is used as a department store, being located in the retail shopping district. Chapel Street runs at right angles with Orange, its intersection with the latter being about six hundred feet from the point of the commencement of the changes in Orange Street covered by the plan. From this intersection to the end of the extension at Union Avenue, where is located the new railroad station, is roughly about three thousand feet.

The steps leading to the laying of the assessment may be briefly detailed as follows: In the year 1913, the General Assembly gave authority to the city of New Haven to issue bonds for public improvements. 16 Special Laws, p. 837. In January, 1913, the city

engineer prepared a layout for a public improvement consisting of the widening and extension of Orange Street from Crown to Commerce Street, and the widening and extension of the latter; and the engineering department of the city prepared a map of the layout. This layout ran through the state armory on Meadow Street. In May, 1917, the General Assembly passed an Act (17 Special Laws, p. 1070, appended in the footnote) authorizing the governor, adjutant-general and attorney-general, acting as a commission, to sell the state armory to three trustees for the city of New Haven, or to the city directly, when the same was no longer required for armory purposes. The purpose of the Act was to permit the city to extend Orange Street to the new railroad depot. In December, 1917, the board of aldermen, board of finance and mayor, acting under authority of the Special Law of 1913 (16 Special Laws, p. 837) authorized an issuance of bonds in the sum of $475,000 to pay for the improvement. These bonds were to be dated April 1st, 1918. Thereafter, at a meeting of the board of aldermen held January 22d, 1918, a communication was received from the city

Section 1. The governor, the adjutant general and the attorney general, acting as a commission for that purpose, are authorized to sell, transfer and convey in the name and behalf of the state, upon such terms and for such amount as may be mutually agreed, to Lewis H. English, Andrew R. Bradley and Isaac M. Ullman, all of New Haven, members of the committee of the chamber of commerce of New Haven, as trustees for the city of New Haven, or to the city of New Haven, all the right, title and interest of the state of Connecticut in and to three certain pieces or parcels of land, with all buildings thereon standing used for armory purposes, situated in the city of New Haven, which pieces of land are more particularly described in certain deeds conveying the same to the state; and recorded in volume 354 on pages 117 and 118, in volume 359 on page 23, and in volume 457 on page 353, on the land records in the office of the town clerk of the town of New Haven, provided said premises shall not be so transferred and conveyed until the same are no longer required by the state for armory purposes, either by the provision of a new armory elsewhere or otherwise, but

planning commission resubmitting to the board this matter which had previously been before it.

The proposed improvement provided for: (1) the widening of Orange Street from Crown to George Streets; (2) the cutting through of Orange Street from George to Commerce Streets; (3) the widening and extension of Commerce Street from Orange Street Extension to Union Avenue, the site of the station; (4) the widening of Portsea Street on the southerly side about fifteen feet between Water Street and Union Avenue; (5) the widening of Water Street on the easterly side about fifteen feet between Columbus and Union Avenues; (6) the establishment of legal grades and building lines upon each of the streets mentioned. On the same date, this communication and the subject-matter were, by vote of the board of aldermen, referred to the department of public works for the purpose of preparing a layout and the assessment of benefits and damages. January 26th, 1918, the director of public works held a hearing and determined upon the layout; and, thereafter, referred the same to the bureau of compensation for the assessment of benefits

said commission may, at any time, contract, for and in the name of the state, either with said committee as trustees for said city or with any officer of said city thereunto duly authorized, to so sell, transfer and convey said premises, at such mutually agreed price stated in said contract, whenever said premises are no longer needed by the state. If title to said premises be conveyed to said committee as trustees, said committee shall transfer the same, or such portion thereof as said city shall require, without profit to them, upon demand by said city, so as to permit said city to extend Orange street in said city to the proposed new railroad depot of the New York, New Haven, and Hartford Railroad Company.

Sec. 2. The proceeds of such sale, or so much thereof as said commission may deem necessary, may be expended in providing other quarters for armory purposes for the use of troops using the lands hereinbefore authorized to be sold, or for the purchase of a new site for an armory for said troops, or both.

Sec. 3. This act shall take effect from its passage.

Approved, May 16, 1917.

and damages thereof, which latter body held a hearing on the same on February 11th, 1918, and thereafter, formulated and transmitted its appraisal and assessment to the director of public works, assessing the plaintiff for benefits in the sum of $1573.50. February 25th, 1918, the director of public works made a report to the board of aldermen to the effect that he had caused a survey and layout and an assessment of damages and benefits to be made. This report was accompanied by the report of the bureau of compensation.

The director of public works recommended to the board of aldermen the adoption of the layout and the assessment of damages and benefits recommended in the accompanying report from the bureau of compensation. In making his report, the director of public works prepared a form of order for the board of aldermen which read as follows: "Ordered, that the report of the director of public works, and accompanying report of the bureau of compensation, be accepted and the layout adopted, and the assessment laid as recommended." Before this report was submitted to the board of aldermen, a clerk in the bureau of compensation and department of public works, desiring to warn the board of aldermen that no appropriation had as yet been made to pay for the damages set forth in the report, but that a bond issue was proposed and was pending, wrote at the end of the proposed order, in red ink, the words "pending bond issue for same," which writing-in clearly appears in the original report. The charter of the city requires (13 Special Laws, p. 412, § 80) that the report, "in case the damages shall exceed the assessment over benefits, shall state whether there has been any appropriation made in accordance with law to pay for the same. . . ." The board of aldermen took no action on February 25th, 1918, and the report was laid upon the table awaiting the bond

issue on April 1st, 1918. On May 6th, 1918, it was taken from the table and accepted, the layout adopted and the assessment made as recommended. This action of the board of aldermen, was approved by the mayor on May 13th, 1918. The record of the meeting of the board of aldermen on May 6th, 1918, adopting the proposed layout and accepting the report of the bureau of compensation and laying the assessment, shows that there were added to the form of the order as recommended by the director of public works the words "pending bond issue for same" so that the record reads as follows: "Ordered, That the report of the director of public works, and accompanying report of the bureau of compensation, be accepted and the layout adopted, and the assessment laid as recommended, pending bond issue for same."

The various sections of the Orange Street extension project were completed on substantially the following dates: The section involving a portion of the extension from Meadow Street to Union Avenue in the year 1918; the section involving the widening of Orange Street between Crown and George Streets in the year 1926; the section consisting of cutting Crown Street through from George to Meadow Street in October or November, 1931. The delay in completion of the improvement was, in part, due to the fact that the layout ran through the armory property of the State of Connecticut on Meadow Street. When, however, this public improvement was proposed and hearings held thereon, it could reasonably be expected by the public and property owners concerned that it would take years to accomplish the task; numerous properties had to be acquired, many large buildings had to be vacated, others had to be torn down and removed, curbs re-set, grades established, pavements laid, etc. In May, 1927, the General Assembly passed an Act (20 Special Laws,

p. 462) selling the state armory property to the city of New Haven for the sum of $200,000 and the further consideration that the city furnish a site for a new armory, which cost the city $45,000. In September, 1928, the city issued bonds in the amount of $45,000 to pay for the new armory site; and in July, 1930, it issued bonds in the amount of $200,000 to pay for the old armory property. In August, 1930, the city found it necessary to secure further money for the carrying through of the improvement and issued bonds in the sum of $50,000. Of this, there remained unexpended the sum of $31,000.

Ever since the order of assessment of May 6th, 1918, approved by the mayor May 13th, 1918, the plaintiff stood by in silence while the city proceeded, over a long period of years, to acquire the necessary land, at great expense, permitted the work to go on knowing its progress and the intention of the city to eventually demand payment of the sum assessed, and waited for the completion of the project before beginning this action. The plaintiff was not misled by the language of any order of the board of aldermen relative to the improvement or the assessment, nor did any of its officers or directors claim that they were misled. The plaintiff made no claim that at the time this project was before the bureau of compensation, department of public works, and board of aldermen it complained that the work would be delayed because of the state armory situation; and at no time until this action did the plaintiff claim to be aggrieved by the order making the assessment against it, and no appeal was taken by it within the time allowed by the charter of New Haven. The plaintiff had notice of all proceedings and hearings thereon as required by the charter of the city.

The plaintiff claims that the assessment against its property is void because on the effective date of the

order, May 13th, 1918, the city had no power to acquire by eminent domain the land occupied by the State of Connecticut as an armory, and because the contemplated improvement required land belonging to the State which the city could not acquire by condemnation, it had no power to proceed with the project or to assess benefits therefor. It may be conceded that an assessment would be void if made for an improvement which the municipal corporation had no authority to make; 5 McQuillin, Municipal Corporations (2d Ed.) § 2174; *Sanderson* v. *Seattle,* 95 Wash. 582, 164 Pac. 217, 219; *Fargo* v. *Gearey,* 33 N. D. 64, 156 N.W. 552, 554; *Cole* v. *Seaside,* 80 Ore. 73, 153 Pac. 569; *Holliday* v. *Atlanta,* 96 Ga. 377, 23 S. E. 406; *Kelly* v. *Luning,* 76 Cal. 309, 18 Pac. 335; or where a municipality had so far departed from the procedure established by the statute as to oust itself of jurisdiction. *Keifer* v. *Bridgeport,* 68 Conn. 401, 411, 36 Atl. 801; *Gregory* v. *Bridgeport,* 52 Conn. 40, 44; *Lexington* v. *Walby,* 33 Ky. Law Rep. 116, 109 S. W. 299, 301.

The power to make this improvement, however, was not dependent upon the right of the city to acquire all the land required therefor by proceedings in eminent domain. The charter of the city provides (13 Special Laws, p. 412, § 80) that the bureau of compensation, after notice and hearing, "shall estimate the total probable expense of taking such land, or of making such public improvement, or discontinuing such highway, or establishing such building lines, and shall assess benefits and damages for and against all persons interested in the matter." Under this provision, where the city can buy land which must be acquired for a public improvement, the bureau may include in its estimate of the cost of the improvement, for the purpose of an assessment of benefits, the probable expense of the purchase of the land.

The charter further provides (13 Special Laws, p. 413, § 81) that "no assessment for benefits shall be collectible nor bear interest until the work for which such assessment was laid shall have been completed." Even though the city could not condemn the armory property, if it was reasonably probable that within a reasonable time it would be able to purchase it, it might properly proceed with the assessment, including in it the estimated purchase price. As the benefits are not collectible and do not bear interest until the improvement has been completed, had the city not been able to buy the property and consequently the improvement had been abandoned, the benefits would not have become payable; and as no certificate of lien for benefits could under the charter be filed against the property affected until after they had become payable, in such a situation as we are discussing, no lien could have been filed at any time.

In view of the Act of the legislature which we have quoted and the magnitude and nature of the improvement, we cannot say, and the trial court has not found, that it was not reasonably probable that when the assessment was made the armory property could not be purchased by the city within a reasonable time or that it was not purchased within such a time. Though the city could not take it by condemnation, it could proceed with the assessment upon the basis of the probable cost of its purchase. Any temporary obstacle or difficulty which hindered or delayed the work did not affect the power of the city to make the improvement, but concerned rather the means of effectuating it. Nor is there force in the claim of the plaintiff that the city was speculating at its expense and that it should not have undertaken to assess benefits until all the land required had been acquired. The provisions of the New Haven charter which provide for the assess-

ment of benefits and appraisal of damages as the preliminary step toward the taking of the land distinguish the case before us from *Chicago* v. *Green*, 238 Ill. 258, 277, 87 N. E. 417, where the local improvement Act provided that no special assessment could be levied for an improvement until the land necessary therefor had been acquired and in possession of the municipality.

The plaintiff claims that the words "pending bond issue for the same" in the vote accepting the layout and authorizing the project, taken in connection with the fact that the vote authorizing the bond issue specified that the avails thereof would be appropriated for the purpose of the improvement, evidenced the intention of the city to pay for the improvement ultimately entirely by the bond issue and not by the assessment. The charter of the city provides (13 Special Laws, p. 434, § 154) that "no public improvement of any kind shall be ordered by the court of common council . . . until an appropriation for said improvement has been duly made." The issuance of bonds for the purpose of making the improvement, with a provision that the proceeds shall be devoted to paying the cost of it would be a sufficient compliance with this requirement. *Woodward* v. *Reynolds*, 58 Conn. 486, 490, 19 Atl. 511. The purpose of the clerk in adding to the proposed vote submitted to the board of aldermen the words we have quoted, as found by the trial court, was to apprise the board that no appropriation had been made but that a bond issue was pending; and when they were incorporated in the record of the vote of the board, certainly no additional significance can be given to them. Read in the light of the circumstances, they cannot be regarded as expressing an intent that the city should ultimately pay for the improvement, using the money raised from the sale of the bonds, and discharging them when due from its general funds, to the exemption of

those specially benefited, even if, under the charter, such a procedure in making an improvement of this kind would be valid. Nor does it appear that the plaintiff was in any way misled by the terms of the vote as recorded.

The plaintiff entirely failed to take an appeal within thirty days from the order of the board of aldermen accepting the report of the department of public works. The thirty-day period allowed for an appeal began to run from the date of acceptance by the board of aldermen of the report of the board of public works. *Katsch* v. *New Haven,* 86 Conn. 326, 331, 85 Atl. 523. The charter provides (13 Special Laws, p. 414, § 85) that upon such appeal, the court may "inquire into the allegations of such application, and may confirm, annul, or modify the assessment or other action therein complained of, or make such order in the premises as equity may require, . . . and said court may inquire into the validity of all the proceedings upon which assessments or other action is based." Inasmuch as the city, by its charter, had jurisdiction to make the assessment, it is valid and binding upon the plaintiff unless appealed from, and cannot be collaterally attacked, after the improvement has been completed, by an injunction, except for some jurisdictional defect. *Keifer* v. *Bridgeport,* 68 Conn. 401, 411, 36 Atl. 801; *Gorham* v. *New Haven,* 82 Conn. 153, 156, 72 Atl. 1012; *Thomson* v. *New Haven,* 100 Conn. 604, 607, 124 Atl. 247.

At the trial, plaintiff called a real-estate expert for the purpose of proving that its land was not benefited by the improvement, and, on that account, the bureau of compensation and board of aldermen were without power to make the assessment, and asked the witness whether or not the plaintiff's property, in his judgment as an expert, was benefited by the proposed improvement. This question was objected to and the objection

38

sustained. This ruling was correct. The charter provides that the bureau of compensation shall assess benefits and damages for or against the persons interested in the matter, and shall estimate how much of said amount shall be paid by each person whose property is specially benefited by the proposed action, and how much shall be paid to each person whose property is damaged thereby. 13 Special Laws, p. 412, § 80. The bureau of compensation has jurisdiction in reference to any property to determine the question whether or not it is in fact benefited; if it assesses benefits where a property is not benefited it commits an error but does not act beyond its jurisdiction. To paraphrase what we said in *Terry's Appeal*, 67 Conn. 181, 185, 34 Atl. 1032, the charter made it the duty of the bureau to assess benefits against any property in fact benefited and this gave it the right to determine whether or not any particular property was in fact benefited, but in the exercise of that jurisdiction—in its determination of the question—it might err because it decided contrary to law. See *Foltz* v. *St. Louis & S. F. Ry. Co.*, 60 Fed. 316, 318; *Delaware & Hudson Co.* v. *United States*, 295 Fed. 558, 560; *United States* v. *Brown*, 281 Fed. 657, 660. To admit proof in this proceeding that the plaintiff's property was not in fact benefited, would not be to show that the bureau was acting without jurisdiction, but only that it committed an error of law.

There is no error.

In this opinion the other judges concurred.