THE CANAL COMMISSIONERS

*v.*

THE SANITARY DISTRICT OF CHICAGO.

*Opinion filed June 19, 1901—Rehearing denied October 9, 1901.*

1. APPEALS AND ERRORS—*appeal lies to Supreme Court if the State is interested.* Section 88 of the Practice act, providing that appeals from circuit courts in all cases in which the State is interested, as a party or otherwise, shall be taken directly to the Supreme Court, was not repealed by implication by the amendment of section 8 of the Appellate Court act. (Laws of 1887, p. 156.)

2. SAME—*State is interested in suits relating to the Illinois and Michigan canal.* The State is interested in suits by or against the commissioners of the Illinois and Michigan canal, concerning property and interests of the same, since the commissioners act in their official capacity for the State, which owns and maintains the canal.

3. SPECIFIC PERFORMANCE—*right to specific performance is not absolute.* A court of equity decrees the specific performance of a contract when by that means it can accomplish more perfect and complete justice than can be attained by an action at law; but the right to specific performance is not absolute, as is the right to recover damages at law.

4. SAME—*contract must be perfectly fair, equal and just to be specifically enforced.* Although a contract may be legal and enforceable, it must be perfectly fair, equal and just, and such as a court of equity will commend, in order to justify a decree of specific performance.

5. SAME—*specific performance will not be decreed if a legal remedy is adequate.* While there are numerous conditions under which a party to a contract will not be permitted to elect to pay damages rather than perform the contract, yet specific performance will only be decreed where the legal remedy or compensatory damages fail to do complete justice between the litigating parties.

6. SAME—*contract of December 21, 1899, between canal commissioners and sanitary district not capable of specific enforcement.* The contract

of December 21, 1899, between the canal commissioners and the
sanitary district, by which the sanitary district agreed to main-
tain a certain depth of water in the summit level of the Illinois
and Michigan canal, cannot be specifically enforced, since to do
so would be to compel the sanitary district to confer a benefit upon
the canal, in addition to compensating for any injury to it.

APPEAL from the Circuit Court of Cook county; the
Hon. E. F. DUNNE, Judge, presiding.

H. M. SNAPP, and C. B. GARNSEY, for appellants.

RUNNELLS & BURRY, and P. C. HALEY, (JAMES TODD,
of counsel,) for appellee.

Mr. JUSTICE CARTWRIGHT delivered the opinion of the
court:

The Illinois and Michigan canal, extending from the
Chicago river to Peru, was constructed by the State of
Illinois and is managed by the appellants as a board ap-
pointed by the Governor. In 1889 the act authorizing the
formation of sanitary districts was passed, and the ap-
pellee, the Sanitary District of Chicago, was organized
under said act. It has constructed a drainage channel
from said Chicago river to Lockport. This suit arises
out of a contract between the canal commissioners and
the sanitary district by which the sanitary district agreed
to supply water to the canal. Some statement of the
nature and history of the two enterprises, as shown by
the evidence, seems to be necessary to an understanding
of the questions at issue.

The canal was opened for business in the year 1848.
The first level of the canal leading from Chicago was
constructed so that the water therein was about eight
feet above Lake Michigan when the latter stood at what
is known as "datum," which is the low-water mark in
Lake Michigan in the year 1847. This first or upper
level of the canal is also called the "summit level," and

extends from Bridgeport, where the canal connects with the Chicago river, at a point about five miles from Lake Michigan, south-westerly about twenty-eight miles, terminating in a lock called "Jack's lock," about two miles north of Lockport, where the canal takes a new and lower level. To supply the canal with water a dam was built across the Calumet river at Blue Island and a channel was cut from thence to the canal. As a further source of supply a feeder from the Desplaines river was provided, and pumping works were erected at Bridgeport to pump water from the Chicago river into the canal. These pumps were used during the dry season of the year. The canal has a slope of one-tenth of a foot to the mile from Bridgeport to Lockport, so that the surface is about three feet lower at Lockport than at Bridgeport. To maintain this level a constant supply of water is required. As the city of Chicago grew and turned sewage into the Chicago river the city became interested in having more water pumped out of said river into the canal, to induce a flow from Lake Michigan into the river instead of allowing the sewage to be carried out into the lake, where the city obtained its water supply. Consequently, in 1858 new and larger pumps were put in at Bridgeport, pumping over 20,000 cubic feet per minute, and the cost of the new pumps and of operating them was divided between the city of Chicago and the canal trustees. The city continued to grow and to discharge more sewage into the river, and in 1865 the legislature authorized it to deepen this summit level of the canal to cleanse and purify the river by drawing a sufficient quantity of water from Lake Michigan through it and through the summit level of the canal to carry the river water and sewage away by means of the canal. The city was to have a lien upon the canal, and the deep cut was completed in 1871, and after the Chicago fire the city was reimbursed for the expenditure. For a number of years after the deep cut was completed there was a sufficient depth of water in the canal from

gravity flow to answer the needs of navigation without pumping. The dam across the Calumet at Blue Island was then removed. In 1883 it had again become necessary for the city to pump from the Chicago river, and it established pumps at Bridgeport which pumped from 40,000 to 50,000 cubic feet of water per minute out of the river into the canal. This was done by the city for its own protection, to keep its sewage out of the lake, and it operated the pumps until it was relieved by turning the sewage into the drainage channel of the sanitary district. The pumps raised the water from the Chicago river into the canal, whence it flowed very slowly toward Lockport. When the sanitary district channel was opened the city had no further interest in pumping water into the canal.

In 1892 the sanitary district commenced cutting its channel, which it claimed to be completed in the latter part of 1899. The canal and drainage channel are practically parallel from Chicago to Lockport. Both connect with the Chicago river and draw their supply of water from Lake Michigan through the river. The inlet to the sanitary channel is at Robey street, and the inlet to the canal is about 2500 feet east, toward the lake. The supply for the sanitary channel is therefore drawn past the inlet to the canal. While the canal and drainage channel are parallel, they are in no way connected with each other. The act for the formation of sanitary districts provides for a commission to be appointed by the Governor to ascertain whether a channel is of the character and capacity required by the act, and upon their report that such is the case the Governor is directed to authorize the water and sewage to be let into the channel. The commission to examine the drainage channel was appointed in May, 1899, and on January 2, 1900, they reported the channel, in substance, complete. The Chicago river is a navigable body of water under the charge and control of the Federal government, which granted permission to the sanitary district to connect its channel

with said river.  The canal commissioners discovered that the admission of water into the drainage channel would lower the level of the water in the Chicago river at the inlet to the canal from two to two and a half feet, and, of course, they knew that the city of Chicago would stop pumping water into the canal.  At the instance of the canal commissioners the Attorney General filed an information in the nature of a bill in equity in the circuit court of Will county to restrain the sanitary district from lowering the level of the water in the Chicago river.  On the petition of the sanitary district this information was removed into the circuit court of the United States, on the ground that a Federal question was involved, and that information is still pending.  The city of St. Louis was also threatening to enjoin the sanitary district from opening its channel, and the Governor of this State refused permission to open it unless it would preserve navigation on the canal.  The sanitary district was very desirous of opening the channel to turn in the water before there should be any interference on the part of the city of St. Louis, and on December 21, 1899, it entered into the written contract with the canal commissioners which is the foundation of this suit.  By that contract the sanitary district agreed that for the period of four months after opening its main channel it would supply the summit level of the canal with a volume of water equal to the average volume which had been supplied to said canal by the pumps at Bridgeport for the year 1899,— not less than 35,000 cubic feet per minute; that it would lower the lock at the junction of the canal with the Chicago river prior to April 1, 1900, so as to maintain a depth of six and one-half feet of water over the mitre-sills of said lock, and that after the expiration of four months it would maintain throughout the summit level of the canal a navigable depth of six feet of water.  The volume of water to be supplied for the purpose of maintaining this navigable depth of six feet was to be determined by the

needs of navigation. The obligation was perpetual, and the sanitary district was to have the right to enter upon the canal in order to make such excavations in the summit level as might be necessary to secure said six feet of water, if it should find that method more economical than to pump that amount of water into the canal. After the execution of the contract and the report of the commission the water was turned into the drainage channel and the sanitary district entered upon a performance of the contract. It re-built the lock at the entrance to the canal and paid the city of Chicago for operating the pumps at Bridgeport until July 16, 1900, when it took charge of them. It maintained a navigable depth of six feet of water throughout the entire length of the summit level of the canal. To maintain said depth of six feet it is necessary to raise the water two and two-tenths feet above datum before mentioned, which is a point generally established and used for the purpose of municipal and other levels and surveys in and around Chicago.

On November 1, 1900, the sanitary district notified the canal commissioners that on and after November 15, 1900, it would cease to pump water into the canal, as provided by the contract, and that it claimed the contract was null and void and of no legal effect. The canal commissioners then filed their bill in the circuit court of Cook county in this case on November 9, 1900, to enforce the specific performance of said contract, and praying for an injunction against the sanitary district from ceasing to supply the summit level with an amount of water sufficient to maintain a navigable depth of six feet, and from violating the terms of said contract. The sanitary district answered the bill, and upon a hearing the court decreed that said district specifically perform the contract from April 1 to November 15 in each year, and that during said portion of each year it should be enjoined from refusing or failing to comply with the contract, and that it should pay the costs of the suit. The decree was un-

satisfactory to both parties,—to the sanitary district because it ordered a specific performance of the contract, and to the canal commissioners because it limited the time during which water should be supplied from April 1 to November 15 in each year, and did not require the water to be supplied whenever it was needed according to their judgment. Each of the parties, therefore, prayed an appeal. The canal commissioners perfected their appeal to this court and are the appellants here, while the sanitary district appealed to the Appellate Court for the First District and is the appellee here. The question which of the appeals was properly taken is raised by motion of appellee to dismiss the appeal to this court, and that motion must first be disposed of.

Section 88 of the Practice act provides that appeals from circuit courts in all cases in which the State is interested, as a party or otherwise, shall be taken directly to this court, and the appeal of the canal commissioners was taken under that provision. The sanitary district insists, in the first place, that said provision was repealed, by implication, by the amendment in 1887 of section 8 of the Appellate Court act. The question so raised was decided to the contrary in *Dement* v. *Rokker*, 126 Ill. 174, where it was held that our jurisdiction given by section 88 of the Practice act was not taken away by said amendment, since the amendatory act was limited, both by its title and subject matter, to Appellate Courts. It was said that if the amendatory act presumed to affect our jurisdiction it would be unconstitutional and void because such an object was not expressed in its title. The cases cited by counsel in support of the motion do not in any manner conflict with that decision.

The sanitary district also contends that the suit is not one in which the State is interested, within the meaning of said section 88, and that the State has no more interest in this suit than in a suit between two counties or two public agencies, or a suit involving any other matter

of a public nature. The State, as such, is not interested in suits of the character mentioned, but in this case the litigation concerns the property and interests of the State. The interest here is not such a remote one as the State may be said to have in a suit of an individual with a tax collector or where there is an attempt to collect a fine or a penalty, but it is a direct interest in the litigation. The canal commissioners act in their official capacity for the State, which is the owner of the canal. The total cost of the canal to the State has been in the neighborhood of $10,000,000, and the cost of the deep cut, for which the city of Chicago was reimbursed, was about $3,000,000. It extends through a number of counties, where it is a local benefit, but it is maintained by the State at great expense. It has not been self-supporting for many years, and nearly every legislature has appropriated large sums of money to supplement its constantly dwindling revenues. A statement of the gross tolls taken on the canal shows that they have decreased from $300,-000 in 1865 to an average of less than $40,000 during the last five years. The State makes up all deficiencies, and maintains a board of canal commissioners, with their equipment, officials and employees, to operate the canal as a State enterprise. The suit being one in which the State is directly interested, the motion to dismiss the appeal is overruled.

As the cross-errors question the action of the circuit court in granting any relief by way of specific performance, they are naturally the first to be disposed of. The principal grounds of objection by the sanitary district to the decree are, that the contract is *ultra vires;* that to perpetually supply the canal with water, or to maintain it, is not within the powers conferred by its organic act, and therefore its officials had no power to enter into the agreement to furnish such supply; that the contract itself is of such a nature that a court of equity should not enforce it by a decree for specific performance, and that

it is oppressive, and was made under such circumstances of coercion that it should not be enforced.

By the act under which the sanitary district is organized it is empowered to construct and maintain a channel for carrying off and disposing of drainage, including sewage of the district; to make and establish docks adjacent to any navigable channel created under the act, and to lease, manage and control such docks, and control and dispose of any water power incidentally created. It is authorized to raise funds for its corporate purposes by taxation of the district. The canal commissioners do not contend that funds to maintain and operate the canal can be raised by taxes levied on the sanitary district, nor that the sanitary district can operate the canal, or assist materially in the maintenance and operation of it, as a primary enterprise of the sanitary district. Nor is it contended that a corporation of the character of the sanitary district is ever estopped to deny its authority to enter into a contract, but it is insisted that by its charter it was authorized to make the contract in question. The sanitary district may sue and be sued, contract and be contracted with, and make any contract necessary or proper to carry into effect the purpose of the corporation. It may take or damage private property for its corporate purposes, and may acquire, by condemnation, purchase or otherwise, any right of way or property needed for such purposes. It is claimed that it has no authority to lower the level of the Chicago river below what it had been, which was practically the same as the level of Lake Michigan, and if it does so and injures the canal it must pay the damages, and therefore it may contract to pay money to avert such an injury or promise to pump water for the same purpose.

The argument that the sanitary district cannot lower the level of the river or the summit level of the canal, but must restore the canal to its former condition, is based, in the first instance, upon the seventeenth section

of the act to create sanitary districts. (Hurd's Stat. 1899, p. 331.) That section is as follows: "When it shall be necessary in making any improvements which any district is authorized by this act to make, to enter upon any public property or property held for public use, such district shall have the power so to do and may acquire the necessary right of way over such property held for public use in the same manner as is above provided for acquiring private property, and may enter upon, use, widen, deepen and improve any navigable or other waters, waterways, canal or lake: *Provided*, the public use thereof shall not be unnecessarily interrupted or interfered with, and that the same shall be restored to its former usefulness as soon as practicable: *Provided, however*, that no such district shall occupy any portion of the Illinois and Michigan canal outside of the limits of the county in which such district is situated for the site of any such improvement, except to cross the same, and then only in such a way as not to impair the usefulness of said canal, or to the injury of the right of the State therein, and only under the direction and supervision of the canal commissioners: *And, provided further*, that no district shall be required to make any compensation for the use of so much of said canal as lies within the limits of the county in which said district is situated except for transportation purposes."

The section so relied upon does not require the sanitary district to maintain the former depth of water in the canal, since the conditions do not bring it within the terms of the section, which relates to a physical entry upon property and authorizes such entry upon certain conditions. There is no connection between the drainage channel and the canal. They each connect with the Chicago river at points about half a mile apart. The complaint is, not that the sanitary district has entered upon property of the canal or used it in any way, but that by permission of the Federal government the sanitary

district is drawing so much water from Lake Michigan through the Chicago river that the surface of the river has been lowered from two to two and a half feet at the point where the water is taken from the river into the canal and the gravity flow is thereby reduced. There has been no entry upon the canal, and its navigation has not been affected by any entry upon it so as to require it to be restored to its former usefulness.

The canal commissioners also contend that, aside from the provisions of said section 17, the sanitary district would be liable for such damages as it might cause to the canal by lowering the water in the Chicago river, and therefore it might contract to prevent such injury by pumping water into the canal. As before stated, the Chicago river is subject to the regulation of Congress and under the exclusive control of the Federal government, (*City of Chicago* v. *Law*, 144 Ill. 569,) and the sanitary district connected its channel with said river by permission of said government. Before such connection was made the Chicago river was practically level from Lake Michigan to the mouth of the canal, and after the connection was made and the drainage channel drew the current from Lake Michigan past the mouth of the canal, it lowered the river from two to two and a half feet. This would be an injury to the canal to that extent, and if we should assume that the sanitary district would be liable for such injury, and that its officials might properly enter into a contract ascertaining the amount of damages and adopting means to avert the injury for which it must respond in damages, the question arises whether this contract is of such a nature that a court of equity would decree a specific performance of it.

A court of equity decrees the specific performance of a contract when by that means it can accomplish more perfect and complete justice than can be attained by an action at law. But the right to a specific performance is not absolute, like the right to recover damages in the

action at law.   Whether the court will compel a party to do the particular thing he has agreed to do is a matter of sound judicial discretion, depending upon the circumstances of the particular case.   Although a contract may be legal and enforceable, it must be perfectly fair, equal and just, and such as a court of equity will commend, or it will not be specifically enforced.   In this case, the evidence shows that the officials of the sanitary district, to meet the demands of the Governor and canal commissioners, went far beyond any purpose or object of preventing the injury that would be done to the canal by lowering the water in the Chicago river.   If the drainage channel had never been constructed or the level of the Chicago river in any manner affected there would not be a navigable depth of six feet of water in the canal.   With the exception of the period after 1871, when the canal was deepened and there was a gravity flow of water from the Chicago river sufficient for navigation, there has never been a time when there was a depth of six feet from such gravity flow.   In 1871 the waters of Lake Michigan stood at an average of twenty inches above datum—the low-water mark of 1847.   A chart published by the Engineering Society of the city of Chicago, in evidence, shows that fact, and that the water in that year was as high as thirty-four inches above datum.   The average height was above datum up to and including the year 1890.   There is also in evidence a report of the deep water way commission to the Secretary of War, showing that the level of Lake Michigan has been permanently lowered at least a foot since about 1890 by the deepening of the channels of the Detroit and St. Clair rivers.   Since 1890 the average height has been about at datum, and in 1892, 1893, 1895 and 1896 the average was below that mark.   The average height of the water would not support navigation in the canal if the river were on a level with Lake Michigan, and the water in the lake is frequently so far below datum that a gravity flow from

191—22

the river on a level with it would leave very little water in the canal. Since 1883 there has never been a time that there was a navigable depth of six feet of water without the aid of the pumps, which constantly threw large quantities into it. The sanitary district is under no obligation to continue the pumping which the city of Chicago did for the purpose of keeping the sewage out of the lake. It also appears that the cost of operating the pumps that were supplying the canal with water according to the contract would be at least equal to the tolls taken on the canal.

If the contract is regarded as a legal one and enforceable at law, its terms are such that a court of equity should refuse to enforce it specifically. To do so would require the taxation of the sanitary district to maintain the canal at a height that would not exist if the district had never interfered with the Chicago river. It would require the sanitary district to confer a benefit upon the canal in addition to compensating for any injury to it. While the level of the water in the lake had averaged about at datum for years before the drainage channel was opened, the decree requires the sanitary district to raise the canal two and two-tenths feet above datum.

Generally, too, a specific performance of a contract will not be decreed where it calls for a continuing series of acts. (Pomeroy on Specific Performance of Contracts, sec. 312.) The defendant must have the capacity and ability to perform the contract, and the court must be able to enter an efficient decree for its performance. It is undoubtedly true that where an action at law would not afford adequate relief, equity will require the performance of continuous acts. In such a case the court might run a railroad, or compel the operation of pumping works, the purchase of new pumps, the collection of taxes to pay the expenses, and other things of that kind. The courts have enforced a specific performance of contracts by one railroad company to give another a right

to run trains over its road where continuous running arrangements were required, and requiring a railroad company to operate a railroad as lessee, and similar agreements, but only because justice could not otherwise be done. The jurisdiction to decree a specific performance of contracts is founded upon the inadequacy or impracticability of the legal remedy. While there are numerous conditions under which a party will not be permitted to elect to pay damages rather than to perform his contract, yet specific performance will only be decreed where the legal remedy or compensatory damages fail to do complete justice between the litigant parties. (Pomeroy on Specific Performance of Contracts, secs. 9-27.) In a case which calls for the intervention of equity, the court will compel a party to do the thing he has agreed to do rather than to pay damages for a breach of his contract; but in this case we do not think that equity should interfere, and that if there is a remedy it should be sought in a court of law, in an action for damages. If the contract is enforceable at law the canal commissioners can recover compensatory damages for the breach of it. If the measure of damages is the cost of pumping, they can hire it done and the cost will be easily ascertained. If the contract cannot be enforced in its entirety but the sanitary district is liable under it, or otherwise, for the injury done to the canal, the damages are as readily ascertainable as in any other case of injury to property.

The question of liability to the extent of the alleged damage to the canal is not before us on this record and is not decided.

Having concluded that the contract is not one which equity will specifically enforce, the decree must be reversed.

The decree of the circuit court is reversed and the cause is remanded to that court, with directions to dismiss the bill.                      *Reversed and remanded.*