## The Sanitary District of Chicago, Appellant, v. Chicago Packing Company et al., Appellees.

### Gen. No. 30,337.

1. DRAINAGE—*primary purpose of statutes relating to Sanitary District of Chicago.* The primary purpose of the legislature in authorizing the creation of sanitary districts and the construction of the sanitary channel and other adjuncts of the Sanitary District of Chicago was the disposal of sewage.

2. DRAINAGE—*right of meat packers to turn trade wastes into channel of Sanitary District of Chicago.* Meat packers have the right to turn their sewage into the channel of the Sanitary District of Chicago but cannot turn into such channel any of their trade wastes that may not be properly designated as sewage.

3. DRAINAGE—*trade wastes of meat packers as sewage.* Garbage, bones, parts of dead animals, and other solid matters are not sewage which meat packers are entitled to turn into the channel of the Sanitary District of Chicago; the contrary is true of the trade wastes of such packers which are liquid or which may be diluted and oxidized by the channel water.

4. DRAINAGE—*estoppel of Sanitary District of Chicago to object to turning of meat packers' trade wastes into District's channel.* The Sanitary District of Chicago is not estopped to object to the turning of meat packers' trade wastes into the District's channel by the fact that such practice has been of long duration, where the practice has been illegal at all times.

5. DRAINAGE—*right of Sanitary District of Chicago to sue to prevent turning of meat packers' trade wastes into District's channel.* Although the Sanitary District of Chicago has no jurisdiction over the sewers of the city of Chicago through which meat packers dispose of their trade wastes which are afterwards dis-

charged into the District's main channel, the turning of such wastes into such channel being illegal equity has jurisdiction at the suit of the District, in view of the duty of the District to keep the channel open, etc., to prevent the continuation of such deposits, even in the absence of special injury to the District's real estate.

6. DRAINAGE—*defense not available to defeat injunction against turning of trade wastes into channel of Sanitary District of Chicago.* Meat packers cannot urge resultant damage to themselves as a defense to a suit to enjoin them from illegally turning their trade wastes into the main channel of the Sanitary District of Chicago.

7. DRAINAGE—*sustaining of general demurrer to bill to enjoin turning of trade wastes into channel of Sanitary District of Chicago held error.* Sustaining of general demurrer to bill to enjoin meat packers from turning their trade wastes into the main channel of the Sanitary District of Chicago held error.

8. EQUITY—*when general demurrer to bill in equity should be overruled.* Where a bill in equity sets forth various claims for relief and the defendant files a general demurrer, the demurrer should be overruled if any of the claims set forth be proper for equitable jurisdiction.

THOMSON, J., dissenting.

Appeal by plaintiff from the Circuit Court of Cook county; the Hon. FRANCIS S. WILSON, Judge, presiding. Heard in the third division of this court for the first district at the October term, 1925. Reversed and remanded. Opinion filed June 23, 1926. Rehearing denied July 8, 1926.

HECTOR A. BROUILLET, for appellant; BRUNDAGE, LANDON, HOLT & BOORD, of counsel.

RYAN, CONDON & LIVINGSTON, for appellees; JAMES G. CONDON, IRVIN I. LIVINGSTON and DAVID J. GREENBERG, of counsel.

MR. JUSTICE O'CONNOR delivered the opinion of the court.

The Sanitary District of Chicago filed its bill of complaint in the circuit court of Cook county, seeking to enjoin the 23 defendants, all of whom are engaged in the meat packing business in the stockyards in Chicago, from disposing of certain of their trade wastes through the sanitary channel constructed and maintained by complainant. Each of the defendants

290    Appellate Courts of Illinois:

Sanitary District of Chicago v. Chicago Packing Co., 241 Ill. App. 288.

filed a general demurrer to the bill and each demurrer contained a special allegation that the bill was multifarious. This special ground is in no way referred to in defendants' brief and we will, therefore, treat the demurrers as general demurrers. After argument an order was entered sustaining the demurrers, and the complainant having elected to stand by its bill of complaint, a decree was entered dismissing the bill at complainant's costs and it appeals, so that the question before us is the sufficiency of the bill.

So far as it is necessary for us to state them, the allegations of the bill are: That the complainant is a municipal corporation, organized and existing under the Act of the General Assembly of the State of Illinois in force July 1, 1889; that before the organization of the complainant the drainage and sewage of Chicago flowed into Lake Michigan by way of the Chicago River, polluting the water supply of the city; that to remedy this the legislature passed the Act of 1889 and afterwards complainant was organized under the act to provide an outlet for the drainage and sewage so that it would flow through the Chicago River into the Des Plaines River and the Mississippi Valley system and away from Lake Michigan; that complainant, under the act, constructed its main channel, commonly called the Drainage Canal, which connects the west fork of the south branch of the Chicago River at Robey Street, in Chicago, with the Des Plaines River, near Lockport, and in 1900 turned the water from Lake Michigan into the Chicago River through the Drainage Canal to the Des Plaines River, thereby preventing the sewage and drainage from contaminating the water supply of the city and suburbs; that afterwards complainant constructed and now operates the north shore channel, which connects the north branch of the Chicago River with Lake Michigan, between Wilmette and Evanston and which intercepts the sewage of several cities and villages lying north of Chi-

cago and diverts it into the Chicago River; that afterwards complainant constructed and now operates a canal known as the Calumet-Sag Channel, which connects the Little Calumet River at a point east of Blue Island with the main channel; that complainant also constructed and now operates certain pumping stations and intercepting sewers, which turn all the sewage from Lake Michigan into the main channel.

It is further alleged that under the act complainant is required to turn into its main channel through the Chicago River, or by other means, not less than 20,000 cubic feet of water per minute for each 100,000 inhabitants of the Sanitary District of Chicago, as long as it uses the main channel as an outlet for disposing of the sewage and drainage; that the complainant is now turning into its main channel the quantity of water required by the act and that the number of inhabitants within complainant's boundaries is now approximately 3,000,000; that the Act of 1889 provides that any channel constructed under the authority of the act, which discharges its sewage without the limits of the district, shall be of sufficient size and capacity to produce a continuous flow of water so that it shall not be offensive nor injurious to the health of any of the people of the State and that before any sewage shall be discharged into any such channel or outlet, all garbage, dead animals or parts thereof, and other solids, shall be taken therefrom.

It is further alleged that the complainant owns in fee simple approximately 6,200 acres of land bordering on the main channel which is of the value of $25,000,-000; that the value of this land depends upon the maintenance of the depth and navigability and lack of noisome and foul water in the channel, and that unless the waters in the channel are kept as the act requires, the land will be of little value.

It is further alleged that the defendants "slaughter and dress cattle, hogs, sheep, fowl and other animals

for food, prepare and manufacture products partly or wholly from slaughtered or live animals, and store and sell live and slaughtered animals" within the region generally known as the stockyards district in Chicago; that each of the defendants in the conduct of its business produces a large quantity of waste material which consists of "garbage, offal, flesh, blood, hair, bone, parts of dead animals and other liquid and solid matter" and that they throw and deposit these into the Chicago River, the common sewers leading into the river and into the main channel and that such waste materials are carried in solution or in suspension into the main channel, and it is alleged that this is in violation of the provisions of section 221 of the Criminal Code of Illinois [Cahill's St. ch. 38, ¶ 453] which provides that it is a public nuisance to throw or deposit any offal or other offensive matter, or the carcass of any dead animal in any watercourse, lake, pond, spring, well or common sewer, street or public highway.   It is further alleged that such waste materials settle to the bottom of the main channel and greatly decrease the depth of the water in the channel and lessen the capacity of the channel to carry the water and sewage; that this increases the current and obstructs and impedes navigation thereby damaging complainant's real property; that a portion of such waste material is diluted and oxidized by the water in the main channel so that the capacity of the water thus used prevents the proper dilution and oxidation of the sewage turned into the main channel; that on account of this part of the sewage is deposited in the bed of the main channel; that part of such waste material flowing in the main channel remains undiluted and unoxidized and does not settle in the bed of the channel, but flows in solution into the Des Plaines and Illinois Rivers and as a result pollutes the water of the channel and makes the same offensive and in-

jurious to the health of the people of the State of Illinois.

It is further alleged that the defendants do not comprise all who have committed the acts above mentioned; that there are other persons, firms and corporations, whose names are unknown to the complainant, and it is impossible for it to ascertain them and impracticable and impossible to make them defendants in the instant case.

The prayer of the bill is that the defendants may be temporarily restrained and upon a final hearing may be perpetually enjoined from depositing and throwing or permitting to be deposited or thrown "garbage, offal, flesh, bone, parts of dead animals and other liquids or solid matter" produced by them in the conduct of their business into the Chicago River, sewer and drainage channel.

The defendants contend that the express terms of the Act of 1889, construed in the light of historical facts, impose upon the complainant the duty of disposing of all of the sewage of the Sanitary District, including the waste from defendants' plants. And in support of this, it is pointed out that the general history of the drainage problem prior to the passage of the Sanitary District Act has been outlined by the Supreme Court of this State in the cases of *Canal Com'rs v. Sanitary Dist. of Chicago,* 191 Ill. 326, and *City of Chicago v. Green,* 238 Ill. 258, and counsel then point out that from 1848 the question of the drainage of Chicago was considered by officials and other persons, surveys and reports were made from time to time, all pointing out that for many years before 1889 the sewage from the city of Chicago and the trade wastes from the defendants' plants were flowing into Lake Michigan by way of the Chicago River and thereby polluting the water supply of the city and that to prevent this it was finally determined to construct a drainage channel and other adjuncts

by which the sewage, including the trade wastes, would be turned from Lake Michigan into the Des Plaines and Illinois Rivers and Mississippi Valley drainage system; that all of these reports and surveys mentioned the fact that part of the pollution of the water of Lake Michigan was occasioned by defendants' trade wastes, and that if the legislature in passing the Act of 1889 had intended that these trade wastes should not be taken care of by the Sanitary District, it would have said so; that the legislature did not distinguish between the sewage of the city and the trade wastes of the defendants or any other trade wastes, and furthermore that this is the construction placed on the act by the officials of the Sanitary District from the time the water was turned into the channel in 1900 until the bill in the instant case was filed. On the other hand, the complainant's position is that it was organized pursuant to the act of the legislature to prevent the drainage and sewage of Chicago and suburbs from flowing into the waters of Lake Michigan, thereby contaminating the water supply, but it was not required by the act, nor was it authorized by the act to receive or dispose of any of the trade wastes of the defendants.

Section 7 of the Act of 1899 provides: "The Board of Trustees of any sanitary district organized under this Act shall have power to provide for the drainage of such district by laying out, establishing, constructing and maintaining one or more main channels, drains, ditches and outlets for carrying off and disposing of the drainage (including the sewage) of such district." In 1921 the legislature amended this section whereby the trustees of the Sanitary District were authorized to lay out, establish, construct and maintain sewage disposal and treatment plants and other works that may be necessary in preventing the water in any channel or outlet which may be discharged beyond the limits of the district from becom-

Sanitary District of Chicago v. Chicago Packing Co., 241 Ill. App. 288.

ing offensive or injurious to the health of any people of the State of Illinois, and that "beginning with the year 1925, some efficient method of treating sewage other than by water dilution shall be annually provided to create an affluent thereof which shall not be offensive or injurious to the health of any of the people of the state and which shall be adequate to care for a population of 300,000, until at least 60 per centum of the present population of the Sanitary District of Chicago has been provided for."

Section 20 of the Act of 1899, among other things, provides: "Before any sewage shall be discharged into such channel or outlet, all garbage, dead animals and parts thereof and other solids shall be taken therefrom." In 1923 the legislature, apparently realizing that it would take some time for the Sanitary District of Chicago to construct treatment plants as required by the amendment to section 7 in 1921, passed an act which empowered the Sanitary District to contract with cities and towns within its limits to use any sewer or drain or treatment works of such city or town and to operate the same. And in 1925 the legislature passed another act authorizing the Sanitary District of Chicago to increase its bonding power from 3 per cent to 4 per cent so as to make funds available for the construction of treatment plants. And the defendants contend, in view of this legislation, that it is apparent that the legislature had in mind that the Sanitary District of Chicago would be required to build treatment plants for the purpose of disposing of such trade wastes as are involved in the instant case as well as the disposal of treatment of sewage and that this evidences a clear intention on behalf of the legislature and of the officials of the Sanitary District of Chicago, at whose request defendants say the amendments to the Sanitary District Act were passed, to require the Sanitary District to take care of the trade wastes of the defendants.

We think the legislation passed in 1921, 1923, and 1925, was occasioned to a great extent by the fact that the quantity of water that might be withdrawn from Lake Michigan through the Chicago River and into the main channel was controlled and might be limited by the Federal officials at Washington, and this reduction in the quantity of water would necessitate the building of treatment plants for the proper disposal of the sewage of Chicago. It had been contended for a number of years by States bordering on the Great Lakes that the withdrawal of water by the Sanitary District would and did lower the level of some of the Great Lakes as well as the St. Lawrence River and thereby interfere with interstate and international commerce, and that the withdrawal of water under these circumstances was illegal and unwarranted. In 1908 the United States brought a suit in the Federal Court at Chicago against the Sanitary District of Chicago to enjoin it from diverting water from Lake Michigan in excess of 250,000 cubic feet per minute. The injunction was awarded and on appeal to the Supreme Court of the United States, the decree of the district court was affirmed. *Sanitary Dist. v. United States,* 266 U. S. 405. The opinion in that case was rendered on January 5, 1925, and in discussing the case the court said that the interest of the Sanitary District of Chicago in diverting water from Lake Michigan through the Chicago River and its channel was "primarily as a means to dispose of the sewage of Chicago. *Missouri v. Illinois,* 200 U. S. 496." In that case the court pointed out that the quantity of water that might be withdrawn from Lake Michigan was under the control of the Secretary of War and the several permits issued by the War Department in this respect are set out in the opinion. Shortly after the filing of the opinion by the United States Supreme Court, the officials of the Sanitary District appeared before the Hon. John W. Weeks,

Secretary of War at Washington, and obtained a permit from him by the terms of which the Sanitary District of Chicago was authorized "to divert from Lake Michigan, through its main drainage canal and auxiliary channels an amount of water not to exceed an annual average of 8500 cubic feet per second" upon condition that such diversion would not affect navigation. And further: "That the sanitary district of Chicago shall carry out a program of sewage treatment by artificial processes which will provide the equivalent of the complete (100%) treatment of the sewage of a human population of at least 1,200,000 before the expiration of the permit." Other conditions are mentioned and the permit by its terms provides that it, "if not previously revoked or specifically extended, shall cease and be null and void, December 31, 1929." This permit was issued by the Secretary of War, March 3, 1925. (Barrett's "The Waterway from the Great Lakes to the Gulf of Mexico" 165.) And subsequently on June 19, 1925, the legislature of this State amended sections 8 and 9 of the Act of 1889, which authorized the corporate authorities of the district to increase their bonding power. So that we think it appears that the legislation passed in 1921, 1923, 1925, was not enacted primarily to enable the Sanitary District to take care of the trade wastes of the defendants and others, but that it appears that the district would be required to dispose of the sewage flowing into the main channel on account of the action of the Secretary of War.

The primary purpose of the legislature in authorizing the creation of sanitary districts and in the construction of the sanitary channel and other adjuncts by the Sanitary District of Chicago was the disposal of sewage. *Sanitary Dist. v. United States, supra; Beidler v. Sanitary District,* 211 Ill. 628; *City of Chicago v. Green,* 238 Ill. 258.

In the *Beidler* case, the court said (pp. 637-638):

''It is evident, from an examination of the act for the creation of Sanitary districts, that the primary and principal purpose of their creation under the statute is to provide for the preservation of the public health by improving the facilities for the final disposition of sewage and by supplying pure water. The fact that a navigable waterway may be created is a mere incident, and not one of the purposes for which a sanitary district is created.'' And in the *Green* case the court said (p. 264): ''A consideration of the various provisions of the Sanitary District Act of 1889 leads, it seems, irresistibly to the conclusion that this act was passed to furnish a common outlet for the sewage of the incorporated municipalities within the limits of the district.''

The proper disposal of sewage by the Sanitary District of Chicago being the primary purpose for which the district was created, authorizes the defendants to turn their sewage into the channel of the Sanitary District of Chicago, but does not authorize them to turn into the channel any of their trade wastes that may not be properly designated as sewage. The bill alleges and the demurrers admit that the defendants ''slaughter and dress cattle, hogs, sheep, fowl and other animals for food, prepare and manufacture products partly or wholly from slaughtered or live animals'' and that in doing so they ''produce a large quantity of waste material which consists    *    *    * of garbage, offal, flesh, blood, hair, bone, parts of dead animals, and other liquid and solid matter'' and that they throw and deposit this into the Chicago River and sewers leading into the main channel.

In our opinion, many of the trade wastes above mentioned are not sewage in any proper sense of the word. Certainly it cannot be said that garbage, bones, parts of dead animals and other solid matters are sewage, while on the other hand, it is true other of the trade wastes which are liquid or which may be diluted and

oxidized by the water flowing in the channel are properly designated as sewage. As to those trade wastes the defendants are authorized to dispose of them through the Chicago River and sewers into the main channel, but they are not authorized to dispose of garbage, bones, parts of dead animals and other solid matters, unless they be diluted and oxidized by the water and as to the latter trade wastes there can be no estoppel against the Sanitary District on account of what has transpired in the past. Whether such trade wastes have since 1900, when the water was turned into the main channel, been thrown or deposited by the defendants into the Chicago River and common sewers so that they come into the main channel does not appear, nor is it material, because it was illegal at all times for such trade wastes to be thrown or deposited into the main channel.

It will be noted that the amendment to section 7 of the Act which was passed in 1921, and which requires the sanitary trustee to establish and maintain plants for the treatment of sewage so as to render it inoffensive and not injurious to the health of the people of the State, provides that such treatment plants shall be adequate to care for a population of not less than 300,000 annually. This provision we think shows that the primary purpose of the act was the disposition of sewage, since it is based on human population and that the matter of taking care of trade wastes is not involved, except such trade wastes as may be designated sewage as above pointed out. Nor do we think that defendants' contention to the effect that the complainant is required to take care of their trade wastes is strengthened by the provision of section 20 of the Act of 1889, which provides *inter alia* that before any sewage shall be discharged into a channel or outlet, such as the main channel, "all garbage, dead animals and parts thereof and other solids shall be taken therefrom." We think this provision was an extra

precaution taken by the legislature so that in case garbage, dead animals or other solids should get into the main channel, the complainant should remove them before they pass into the Des Plaines River, but it is not to be construed as authority for the defendants or other concerns to throw or deposit through sewers or directly into the Chicago River or the channels thereof their garbage or dead animals. It certainly would be an unreasonable construction to say that the defendants had a right to place such materials so that they come into the main channel and then require the complainant to remove them.

The defendants further contend that the demurrer was properly sustained because the complainant has no jurisdiction over the sewers of the city of Chicago into and through which the defendants disposed of their trade wastes. And they further contend that the allegations of the bill fail to disclose any special injury to the complainant, and finally that under the equitable rule of relative convenience, an injunction will not be awarded where it will be productive of greater harm to the defendants than benefit to the complainant. We think none of these contentions can be sustained. It is true that complainant has no jurisdiction over the sewers of the city of Chicago, but when it is made to appear that certain of the trade wastes of the defendants are being illegally discharged into the main channel and since the law requires the complainant to keep the channel open and the water including the sewage therein from being contaminated so as not to be injurious to the health of any of the people of the State of Illinois, we think equity has jurisdiction to prevent the continuation of such illegal deposits and this too, whether there be any special injury to the real estate belonging to the complainant or not. Complainant is a municipal corporation charged by law with the duty of constructing and maintaining an outlet for the sewage and to so

dilute or dispose of the sewage as not to be injurious or offensive to the people of the State of Illinois. What damage the defendants will sustain, in being restrained from depositing certain of their trade wastes above mentioned so that they come into the main channel, we are unable to say from the record, but this element cannot be controlling in view of the fact that we hold that under the law certain of the trade wastes may not be thrown or deposited into the main channel.

It follows from what we have said that the bill of complaint stated a good cause of action as to certain of the trade wastes and as to certain other trade wastes it did not state a cause of action, but in these circumstances, since the demurrer was general, it should have been overruled, because it is the law that where a bill sets forth various claims for relief and the defendant files a general demurrer, the demurrer should be overruled, if any of the claims set forth be proper for equitable jurisdiction. *Brown v. Hogle,* 30 Ill. 119; *Snow v. Counselman,* 136 Ill. 191; *Kinder v. La Salle County Coal Co.,* 301 Ill. 362; *Miller v. Hale,* 308 Ill. 275; Sec. 443 Story's Eq. Pl.

The decree of the circuit court of Cook county is reversed and the cause remanded with directions to overrule the demurrers.

*Reversed and remanded.*

TAYLOR, P. J., concurs.

THOMSON, J., dissenting: I am unable to concur in the decision of this case as announced in the foregoing majority opinion. In that opinion it is said that the primary purpose for which the Sanitary District of Chicago was created was the disposal of sewage, from which the conclusion is reached that the defendants may turn into the channels of the District, through the sewers, such of their trade wastes as may be contemplated within the term sewage.

302    Appellate Courts of Illinois.

Sanitary District of Chicago v. Chicago Packing Co., 241 Ill. App. 288.

In *People ex rel. Longenecker v. Nelson*, 133 Ill. 565, the Supreme Court pointed out that the purpose of the Sanitary District Act was "the preservation of the public health," and that the scheme provided by the act "was formulated mainly if not exclusively with reference to the sanitary condition and needs of the City of Chicago and its environs." The court called attention to the fact that Lake Michigan was the source of the water supply of the territory embraced within the Chicago Sanitary District, and that a proper construction could not be given to the meaning of the act without taking into account the situation of the territory embraced within the Sanitary District of Chicago. The court then said: "The object of the system of drainage proposed by said Act is to prevent the drainage and sewage of the city and its environs being carried into Lake Michigan, thereby contaminating the waters of the lake," by providing a channel which will give an outlet "for the drainage and sewage of the city" through the Desplaines and Illinois Rivers. Similar language was used by the court in *City of Chicago v. Green*, 238 Ill. 258, and in *City of Chicago v. Sanitary Dist. of Chicago*, 272 Ill. 37, where the court said that "the Sanitary District was organized mainly to solve the sanitary and sewage problems of the City of Chicago by giving it an outlet for its drainage and sewage and preventing the contamination of the waters of Lake Michigan. * * * The object for which the Sanitary District was organized is accomplished by providing and maintaining a channel sufficient to carry through it, the drainage emptying into it by the municipalities in the district."

By the terms of section 7 of the Sanitary District Act, the board of trustees of any district organized under the act is empowered to construct and maintain channels for carrying off and disposing of "the drainage (including the sewage) of such district."

Sanitary District of Chicago v. Chicago Packing Co., 241 Ill. App. 288.

Even if the legislature had used no other term than "sewage" in the course of the provisions of the sanitary act and the dictionary definitions of that word were such as to confine its meaning to that contended for by complainant in this case, that meaning, in my opinion, would not necessarily control. In *City of Chicago v. Green, supra,* the Supreme Court said: "Whenever the meaning of a word in a legislative act is important, we must discover its meaning by finding the sense in which it was intended to be used by the legislative body, for that must control." In construing the Sanitary District Act in that case the court said: "While we think the wording of the law is clear and unambiguous, if there be any doubt as to its meaning, the courts may, in order to find out its purpose or intent, take into consideration the contemporary circumstances and external or historical facts which led to its enactment, and read it in the light of such surrounding facts. In seeking for the legislative intention, we may consider not only the language used, but also the object to be attained and the evil to be remedied."

What was the evil which the legislature sought to remedy by the passage of the Sanitary District Act and the object thereby sought to be attained? It is a matter of common knowledge that the "drainage (including the sewage)" of Chicago and the surrounding territory, prior to the passage of the Sanitary District Act and the operation of its channels by the Chicago Sanitary District, passed into Lake Michigan and contaminated the water supply and that this evil grew more and more serious as the community increased in size and the drainage flowing into the lake increased in amount; that the problem affecting the public health, which was thus presented, was considered and studied by committees and commissions created for the purpose and various recommendations were made, and the object of the legislature in pro-

viding the scheme contained in the Sanitary District Act, and in passing that legislation, was to furnish a solution to that problem and provide for "the preservation of the public health" by removing the contamination to the water supply, and turning all the material that had been theretofore draining into Lake Michigan through the Chicago River and the sewers, away from that water supply, and so diluting and treating such material as to carry it off through the rivers in the Illinois Valley in such a manner that it would be "neither offensive nor injurious to the health of any of the people of this State." It is further a matter of common knowledge that prior to the passage of the Sanitary District Act and the operation of the Drainage Canal by the Chicago Sanitary District, as contemplated by that act, one of the chief contaminating elements entering into the drainage problems in Chicago was the trade wastes which were emptied into the sewers and through them into the Chicago River and Lake Michigan, by those engaged in the meat packing industry in the Union Stock Yards, and by others engaged in various other lines of industry.

The history of the attempts to keep the "drainage (including the sewage)" of Chicago and its environs out of Lake Michigan, by various means, prior to the passage of the Sanitary District Act, is fully set forth in the opinions of the Supreme Court in *Canal Com'rs v. Sanitary Dist. of Chicago,* 191 Ill. 326, and *City of Chicago v. Green, supra.* In the latter opinion the court refers to many of the contemporary circumstances and historical facts which led to the enactment of the act, and in that connection the court makes many references to a work on Drainage Channel and Waterway by G. P. Brown, to which work counsel for defendants have also called our attention in the case at bar. The title page of the work referred to recites that it is "a history of the effort to secure an effective

and harmless method for the disposal of the sewage of the City of Chicago, and to create a navigable channel between Lake Michigan and the Mississippi River," and it is further stated that this history was prepared "by authority of the Board of Trustees of the Sanitary District of Chicago," the complainant in the case at bar. It was published in 1894. As pointed out by the Supreme Court in the *Green* case, Brown's history of the growth of the evil involving the contamination of Chicago's water supply, and the elements entering into that evil, gives an account of the studies made of the problem by the commissions appointed for that purpose from time to time. One such commission in 1887 pointed out that the problem demanded two things, "the protection of the water supply and the removal of the river nuisance." It is pointed out by the complainant's historian that at one stage of the study of this problem the chief engineer of the Board of Public Works of Chicago, in discussing the causes of the pollution of the Chicago River and the consequent pollution of the water supply of the city, stated that while the sewers were responsible to some extent, *the pollution was chargeable chiefly to the discharge of blood and other refuse from the slaughter and packing houses in and around the city,* as well as from the distilleries, glue factories and works for rendering offal. Brown on Drainage Channel and Waterway, 66.

In 1865, arrangements were made with the commissioners of the Illinois and Michigan canal by which they agreed to pump water from the Chicago River into the canal at certain times by means of the Bridgeport pumping works. Complainant's historian points out that this action was taken in large part by reason of the pollution of the south branch of the Chicago River, *for which the increasing business of the packing houses at Bridgeport was mainly responsible.* It is pointed out that the number of animals slaughtered

was greatly increasing and this growth in the packing industry was resulting in a correspondingly increasing pollution of the river. In 1871, the packing houses were removed from Bridgeport to their present location in the city of Chicago. Brown, 307.

In the report of the Drainage and Water Supply Commission, submitted in 1886, it was pointed out that the "south (west) fork of the south branch of the Chicago River received a large amount of sewage and *was charged with the waste from the Union Stock Yards and packing houses* and that it had no artificial or other means for circulation of its water and therefore it was in a very filthy condition." Brown, 305-351.

In May, 1887, the legislature appointed a commission to examine and report to the next session of the legislature, on the subject of the drainage of Chicago and its suburbs. This commission reported the Sanitary Act, substantially as it was passed by the next legislature. In its report accompanying the submission of the proposed act the commission stated to the legislature that it had diligently studied the subject submitted to it, "in all its sanitary and commercial aspects * * *. All plans for meeting the demands of the river and valley communities and the pressing needs of Chicago have been carefully examined by this commission. The plan agreed upon by the Commission, as set forth in detail in the bill which accompanies this report, is believed by the Commission to be the most feasible, practicable, and satisfactory method for all the varied interests involved." Brown, pp. 375-376; *City of Chicago v. Green, supra,* p. 270.

In my opinion it thus clearly appears, from the history set forth by authority of the complainant itself, that when the legislature approved the report of the commission last referred to, and adopted the plan recommended by it, having to do "mainly if not exclusively," (*People v. Nelson, supra,*) with the solving

of the problem of removing the source of the contamination of the water supply of Chicago and its environs, and the proper disposal of all its drainage, which had up to that time been contributing to that contamination, a problem affecting the health of everybody living within the district, which problem the commission reported it had diligently studied, "in all its sanitary and commercial aspects," and when the legislature passed the bill (Sanitary District Act of 1889) substantially as submitted by the commission, and thereby empowered the trustees of any sanitary district organized under the act, to "provide for the drainage of such district" by establishing and maintaining channels for carrying off and disposing of "the drainage (including the sewage) of such district," it was the very evident intention of the legislature to thereby provide a method for disposing of everything which had theretofore been finding its way into Lake Michigan through the sewers and the Chicago River, including the trade wastes from the packing houses in the stockyards, as well as from other industries. If by the passage of the Act of 1889 it had been the intention and purpose of the legislature to empower the trustees of the Chicago Sanitary District, with reference to which the act mainly had to do, to carry off and dispose of the sewage of the district, using that word in its restricted sense, but not to carry off the trade wastes which had theretofore been such a material contributing factor to the problem affecting the water supply and the sanitary condition of the district, then, I believe the legislature would have drawn a clear distinction between those classes of drainage, but it did not do so, and in the language it did use, I am unable to find any indication of any such purpose.

It therefore is my opinion that under the terms of the Sanitary District Act the complainant in this case is empowered and obliged to carry off and dispose of

all such trade wastes from the industries in this district as were found in the drainage which was moving into Lake Michigan, through the sewers and the Chicago River at the time the Sanitary District Act was passed, and had been for years prior thereto. This has been the construction of the Sanitary District Act adopted by the complainant itself, and followed ever since the Drainage Canal has been in operation and up to the time of the filing of the bill of complainant in the case at bar, for it is a matter of common knowledge that ever since the complainant began operation under the act, those engaged in the packing industry have disposed of their trade wastes through the sewers and channels of the district and the district has carried off and disposed of them as provided by the act. In my opinion, the course which the trustees have pursued under the act, with reference to those trade wastes, amounts to an executive construction of the act, which is the opposite of the construction they now seek to place upon it. Our Supreme Court has said in *Nye v. Foreman,* 215 Ill. 288, and *Cook County v. Healy,* 222 Ill. 310, that "when it appears that executive officers charged with the duty of applying the law, have, by contemporaneous, long, uniform and practical construction, accepted and acted upon it as having a definite and practical meaning, the conclusion so reached and acted upon by such officers will, in view of the great injury and injustice which would result from a change in such construction and meaning, be accorded great weight by the judiciary when that department of the government is called upon to construe the law, and will in general control."

I am further of the opinion that the recent amendments to the Act of 1889, which have been adopted by the legislature, indicate a legislative confirmation of the intention which was present at the time the original act was adopted as· above set forth. If we may take judicial notice of the fact that these recent amend-

Sanitary District of Chicago v. Chicago Packing Co., 241 Ill. App. 288.

ments, providing for disposal and treatment plants and requiring the complainant to establish and maintain them beginning with the year 1925, were prompted in some degree by the attitude of the Federal Government, concerning the amount of water the Sanitary District of Chicago might withdraw from the lake and pump into its channels, as indicated in the majority opinion, we may also take judicial notice of the fact that the materials which the complainant was carrying away and disposing of through its channels have, in recent years, been greatly increasing in quantity, not only by reason of the increase in population of the District, but also by reason of the industrial growth of the District. It is not my understanding that it is contended by the defendants that these recent amendments, providing for treatment and disposal plants, were enacted primarily to enable the complainant to take care of the trade wastes of the defendants and others. It may well be, as stated in the majority opinion, that such was not their object primarily. But, in my opinion, the significance of those amendments is that they not only empower, but require, the complainant to dispose of certain quantities of the drainage of the District by means of treatment plants, and as in the original act, so in the amendments, no distinction is made as to the classes of drainage to be so treated. It is a matter of common knowledge that these amendments were adopted at the solicitation and instigation of this complainant, itself, and the last of the amendments referred to was adopted by the legislature after the complainant had begun the suit at bar and while that suit was pending in the trial court. If it had been the intention that the disposal plants were not for the purpose of treating trade wastes as well as other drainage, and if the burden of the District had come to be such, by reason of the increase of drainage and sewage, that it was necessary to afford the complainant some relief from the obligations

which the Act of 1889 placed upon it, and which it has since been carrying out, and the legislature had had any thought of eliminating trade wastes from the operation of the act, again the opportunity was presented to accomplish it, and the fact that it was not done, even though at the time the last amendment was adopted the complainant was seeking the relief prayed for in this bill, in my opinion indicates clearly that the intention of the legislature in adopting the amendments was to increase the facilities of the complainant for continuing its work of disposing of the drainage of this district, just as it has been disposing of it ever since it began to operate under the original act.

The majority opinion calls attention to the fact that the amendment to section 7, passed in 1921, requires that "in the case of the Sanitary District of Chicago, beginning with the year 1925, some efficient method of treating sewage other than by water dilution shall be annually provided to create an effluent thereof, * * * which shall be adequate to care for a population of not less than 300,000, until at least 60 per centum of the present population of the Sanitary District of Chicago has been provided for," and the opinion then states that this shows that "the primary purpose of the Act was the disposition of sewage since it was based on human population," and, therefore, the matter of taking care of trade wastes is not involved, "except such trade wastes as may be designated as sewage." In my opinion, the point made is untenable. I am unable to see that the provision referred to indicates anything to the effect that the provisions should not include trade wastes. Even counsel for the complainant, in the brief filed in this court, point out that the complainant's own engineers have, themselves, used a human population unit in measuring trade wastes, for the brief tells us that complainant's engineers after an extended investigation have reported that the stockyards trade wastes, which the

complainant has been carrying away and disposing of through its channel, "are equal in amount to the ordinary sewage of a population of one million."

The majority opinion further states that the complainant is required to carry off and dispose of, under the provisions of the Sanitary District Act, such trade wastes as may be diluted and oxidized by the water flowing in its channel, but that it is not authorized or required to dispose of the wastes complainant describes in its bill of complaint, "unless they may be diluted and oxidized by the water." In my opinion the method of disposal of drainage by treatment plants as well as by the dilution method, should be taken into consideration, with reference to these wastes, in view of the action of the legislature in passing the amendments of 1921 and 1925.

Complainant has called our attention to section 221, of division 1 of the Criminal Code (Cahill's St. ch. 38, ¶ 453) and contends that when the legislature passed the Sanitary District Act it must be presumed to have known that said section was in full force and effect, and that, therefore, the sewage referred to in the Act of 1889 may not be considered as including trade wastes. The section referred to declares what shall be considered as constituting a public nuisance, and, among other things, declares that it shall be a nuisance to throw or deposit any offal or any other offensive matter, or the carcass of any animal in any watercourse or common sewer. This statute on nuisances, passed by our legislature in 1874, is in lieu of R. S. 1845, page 175, section 134, and a later statute found in Laws of 1861, page 270, paragraph 1. The "common sewer" of 1845, or 1861, or even of 1874, was a far different thing from the Sanitary District channels provided for by the Sanitary District Act of 1889. In my opinion, in so far as the Sanitary District Act provides for the carrying off and disposal of the drainage of the Sanitary District of Chi-

cago, that act must be considered as superseding the provisions of section 221 of division 1 of the Criminal Code, to the extent of any conflict there may be in their terms *(Village of Atwood v. Cincinnati, I. & W. R. Co.,* 316 Ill. 425; *Northern Trust Co. v. Chicago Rys. Co.,* 318 Ill. 402), and in so far as the latter may be considered as having had application to the territory within the District, and to have theretofore applied to any part of the subject matter covered by the later act. Moreover, in *Walker v. City of Aurora,* 140 Ill. 402, our Supreme Court has said that section 221 of the Criminal Code does not constitute an absolute prohibition against the discharges of the substances therein referred to, into any watercourse or sewer but that it merely prohibits such discharge in a manner that will cause injury to others. In that case the court held that a proposed sewage system which was to empty into the Fox River could not reasonably be considered a violation of the provisions of section 221 of the Criminal Code. In my opinion we find another clear recognition by the legislature of the fact that trade wastes, under the Act of 1889 and its amendments, are properly part of the drainage of the Chicago Sanitary District, to be carried off and disposed of by the District through its channels and the Des Plaines and Illinois Rivers, in an act recently passed by the legislature entitled, "An Act Creating a Rivers and Lakes Commission for the State of Illinois, and defining the duties and powers thereof." Section 14 of that act (Cahill's St. ch. 19, ¶ 72) provides that it shall be unlawful for anyone to discharge industrial wastes or any refuse containing solids into any watercourse in the State, "provided, however, that the provisions of this section shall not apply to that portion of the Des Plaines River lying down stream from any point at which the waters of the Sanitary District of Chicago have been or are discharged into said Des Plaines River."

Of course, the defendants should not be permitted to dispose of anything and everything through the channels of the complainant, and the contention of complainant that the interpretation of the act urged by defendants leads to that result is, in my opinion, untenable. By the terms of the Act of 1889 and the amendments thereto, the complainant is required to carry away and dispose of only such materials as are shown to be proper trade wastes and such as were being disposed of through the sewers and the Chicago River, and thus into Chicago's water supply, when the legislature passed the Act of 1889, and thus established the public policy of disposing of them through the channels of the Sanitary District. The complainant, by the allegations of its bill, does not complain of certain specific trade wastes, alleging that they are not the kinds of wastes which were discharged into the sewers or the river and were a part of the drainage finding its way into the lake, at the time the Sanitary District Act was passed, and so could not have been within the contemplation of the legislature at that time, but that since that time the defendants have come to dispose of them in the manner complained of. Complainant's bill is so broad as to include all the trade wastes of the defendants. It asks that the defendants be enjoined from putting into the channels of the District certain specified materials, and "other liquid or solid matter produced by them." Such relief must be based on the theory that under the Act of 1889 and the amendments thereto, the complainant is under no obligation, so far as trade wastes are concerned. In my opinion, that theory is not tenable. If, in fact, the defendants are attempting to dispose of, through the channels of the Sanitary District, materials not properly considered as trade wastes, and which may be said not to have been within the contemplation of the legislature, when the method of disposal provided in the Sanitary District Act was

adopted, and the complainant seeks relief as against such materials, then it should be required to amend its bill, and base its prayer for relief on that theory and confine it to such materials. In my opinion, the principle invoked in the last paragraph of the majority opinion may not properly be applied in the situation presented by this bill. The chancellor, in my opinion, properly sustained the demurrers interposed to the bill by the defendants.